UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

     *-v.-*                                          :         20 Cr. 577 (NSR)

DAVID KAUFMAN,                                    :
    a/k/a "David Khalifa,"
    a/k/a "John Morray,"                           :
    a/k/a "Big Man,"
                                 :

                         Defendant.

                                 :
----------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING SUBMISSION

## REDACTED COPY


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
Attorney for the United States of America


Jane Kim
Assistant United States Attorney
- Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of sentencing in this matter, which is scheduled for April 14, 2022, and in response to the defendant's submission filed on April 7, 2022 (Dkt. 35).  For the reasons discussed below, the Government respectfully submits that a sentence at the top of the applicable Guidelines range of 30 to 37 months' imprisonment is necessary and warranted in this case.[1]

This case is exceptional.  In or about February 2019, the defendant sent a bomb threat to his female neighbor ("Victim-3")[2] in which he asserted that he would "rape you till you cry"; "tear your skin off and rape your face open stupid whore"; "Cunt I will rape you endlessly"; and "Your[sic] going to die."  (PSR ¶ 32(c)).[3]  Later that month, he harassed another female victim by text message ("Victim-6").  A few months later, in or about October 2019, the defendant began a spree of incessantly stalking, harassing, and threatening two principal victims ("Victim-1" and "Victim-2"), among others.  (*Id.* ¶¶ 14-29).  The defendant's stalking spree was complex and calculated, involving his creation and use of over 50 social media accounts, his attempted impersonation of Victim-1 and Victim-2, and numerous threats of violence, rape, sexual assault, torture, and murder.  (*Id.*).  The defendant's criminal conduct was fueled by his "Incel" ideology.  "Incels" or the "Involuntary Celibate" are a growing group of domestic extremists who believe that they are entitled to sex with women, promulgate white supremacist and misogynist ideology,

---

[1] The defendant faces a mandatory minimum sentence of one year in prison.  As of the date of this submission, the defendant has been detained for approximately 19 months.

[2] Numbered references to the victims are consistent with those used in the Complaint (Dkt. 2) and in the U.S. Probation Office's Presentence Investigation Report, filed on March 7, 2022, referenced herein as the "PSR" (Dkt. 30).

[3] All victims of the defendant's threats and harassment are collectively referred to herein as the "Victims".

and incite and commit acts of violence against women, including sexual assault, rape, torture, and murder. (*Id.* ¶¶ 10-12). In July 2020, he told law enforcement officers that he intended to harm the Victims by "instill[ing] fear in [them]." (Ex. E at 2).

Alarmingly, in the summer of 2020—even after the defendant was approached by local law enforcement numerous times, arrested and charged with state crimes, and ordered by a judge to stop contacting, stalking, and harassing the Victims—the defendant refused to abide by the law. (*Id.* ¶ 34). Undeterred, the defendant flouted law enforcement warnings and violated the state court's order by continuing to harass and stalk the Victims. (*Id.*). He also began to plan an attack by conducting surveillance of Victim-1 and researching how to unlawfully obtain and assemble firearms. (PSR ¶ 34; *id.* at 22). His efforts were thwarted when he was federally charged, arrested, and detained pending trial because of the danger he posed to the public.

The defendant continues to pose a real and significant danger to the Victims and to the community. (*See infra* at 25-26) (citing Def. Exs. C-E)). In the words of his own psychiatrists, the defendant "remains very troubled" with a "rigid irrational belief system"; he continues to harbor hostility and resentment towards women consistent with Incel ideology; and his "combination of impulsivity, anger, and dysphoria" places the defendant at "increased risk for self-harm or acting out behaviors," including violence against others. (Def. Ex. D at 2). Indeed, each of the Victims fears his release into the community. (PSR ¶¶ 38-40; Exs. A-C (Victim Impact Statements)).

In seeking a sentence of time-served, the defendant dramatically overstates his mental deficits, cites incomplete records, and seeks to portray himself as an immature, boyish victim. Not once in the defendant's submission does he express remorse or take responsibility for his crimes. Nor does he take into account the profound trauma he continues to cause, his repeated disregard

for the law, his extremist beliefs, and the danger he poses to the Victims and the public.  Instead, the defendant—a nearly 30-year-old man who has enjoyed the privileges of higher education, an upper-middle-class lifestyle, musical studies, familial and financial support, and lifelong counseling (PSR ¶¶ 64-72)—attempts to present himself as a child whose depression and other ailments are to blame.  He cites an outdated diagnosis from 1996 when the defendant was two years' old.  (Def. Ex. A).  He asserts that out-patient therapy is sufficient here.  Tellingly, however, the defendant fails to acknowledge that during the year he committed the offense conduct, he was living with his parents, employed with the U.S. Postal Service as a mail carrier, and was receiving both out-patient therapy and the same medications he is currently prescribed.  None of these circumstances deterred or prevented him from relentlessly stalking and terrorizing the Victims.

The defendant's conduct has had a profound impact on the Victims. (Exs. A-C).  The Government understands that Victim-1, Victim-2, and Victim-3 would like to speak at sentencing, and their Victim Impact Statements are enclosed herein.  (*Id.*).  The Government respectfully requests that the Victims be afforded their statutory right to be heard at sentencing under the Crime Victims' Rights Act.  18 U.S.C. § 3771(a)(4) ("A crime victim has the . . . right to be reasonably heard at any public proceeding in the district court involving . . . sentencing.").

For these reasons, and the reasons discussed below, the Government respectfully submits that a sentence at the top of the Guidelines range of 30 to 37 months' imprisonment is necessary and warranted in this case.  Such a sentence is necessary to protect the Victims and the public from future crimes of the defendant, for purposes of specific and general deterrence, to promote respect for the law, to provide just punishment, and to reflect the seriousness of the defendant's criminal conduct.  18 U.S.C. §§ 3553(a)(1), (2)(A)-(C).

## BACKGROUND

### I.    The Defendant Is A Self-Identified Incel

The defendant is a self-proclaimed Incel.  (PSR at 21; Ex. E at 2).  "Incels," or the "Involuntary Celibate," are domestic extremists.[4]  (PSR ¶ 10).  They are a growing movement of largely men who propagate a violent, extremist, and misogynist ideology of white male supremacy and incite acts of violence against women, including rape, sexual assault, torture, and murder.  (*Id.* ¶¶ 10-12).  Incel ideology derives from a belief that men are entitled to sex with women and to women's bodies.  (*Id.* ¶ 10).  Incels therefore blame and vilify women who refuse to have sex with them or decline their advances.  (*Id.*).  Incels often portray themselves as victims who are driven to violence because of their sexual and other grievances.

Incels have an active online community, including numerous online chat rooms and message boards in which Incels often discuss, among other things, their hatred of women, how to get away with rape, how to drug women so that they can be raped, and specific women who should be targeted.  (*Id.* ¶ 11).  Incels have coined their own terms.  For example, "Stacy" is an Incel term that refers to an attractive female who rejects or refuses to have sex with an Incel.  (*Id.* ¶ 19 n.2).  "Chad" is an Incel term that refers to an archetypal white alpha male who receives female attention.  (*Id.* ¶ 16 n.1).  Incels harbor deep hatred and hostility towards "Stacys" and "Chads".

---

[4] *See, e.g.*, Hot Yoga Tallahassee: A Case Study of Misogynistic Extremism, U.S. Department of Homeland Security, U.S. Secret Service, National Threat Assessment Center (Mar. 2022), available at https://www.documentcloud.org/documents/21417518-secret-service-2018-yoga-class-shooting-case-study (last visited Apr. 7, 2022) ("USSS Report"); "The Threat Landscape: Incel and Misogynist Violent Extremist," McCain Institute (Aug. 2, 2021), available at https://www.mccaininstitute.org/wp-content/uploads/2021/10/incel-and-misogynist-violent-extremism-read-ahead-materials-august-2.pdf (last visited Apr. 2, 2022); Bruce Hoffman and Jacob Ware, "Incels: America's Newest Domestic Terrorism Threat," Lawfareblog.com (Jan. 12, 2020), available at https://www.lawfareblog.com/incels-americas-newest-domestic-terrorism-threat (last visited Apr. 3, 2022).

Since 2014, Incel adherents have murdered approximately 50 victims, including through at least six mass-murders, in addition to countless other acts of violence against women.  (*See id.* ¶ 12).  For example:

- In or about 2014, a self-proclaimed Incel named Elliot Rodger declared a "War on Women" and killed six people and injured 14 others near a college campus in California.  (PSR ¶ 12). Prior to these attacks, Rodger posted a video manifesto online, in which he explained that he planned his attack to punish women for rejecting him and for depriving him of sex, and to punish sexually active men because he envied them.  (*Id.*).

- In or about 2018, a self-proclaimed Incel named Alek Minassian murdered 10 victims and seriously injured 16 others by driving a rented cargo van into pedestrians in Toronto, Canada.  Prior to the attack, Minassian wrote: "The Incel Rebellion has already begun! We will overthrow all the Chads and Stacys!  All hail the Supreme Gentlement [sic] [Elliot Rodger]!"[5]

- In or about 2021, invoking Incel ideology, Jake Davison murdered five victims in England, including his own mother, a three-year-old girl and her father, and a couple within six minutes.  Prior to the attack, Davison had been actively involved in Incel communities online and posted online videos invoking Incel ideology.[6]

## II.    The Defendant's Offense Conduct

### A.    February 9, 2019: The Defendant Sends a Bomb, Rape, and Death Threat to Victim-3

On or about February 9, 2019, the defendant wrote and sent a bomb, rape, and death threat to Victim-3, a young woman who grew up living down the street from the defendant and his family in Cortlandt Manor, New York.  (PSR ¶ 32(c); *id.* ¶ 70 (noting that the defendant intends to resume living with his parents in their home in Cortland Manor (the "Kaufman Residence"), which is

---

[5] Leyland Cecco, "Canadian 'incel' killer found guilty of murder over Toronto van attack," The Guardian (Mar. 3, 2021), available at https://www.theguardian.com/world/2021/mar/03/toronto-van-attack-guilty-murder (last visited Apr. 2, 2022); Gianluca Mezzofiore, "The Toronto suspect apparently posted about an 'incel rebellion.' Here's what that means", CNN.com, available at https://www.cnn.com/2018/04/25/us/incel-rebellion-alek-minassian-toronto-attack-trnd/index.html (last visited Apr. 2, 2022).

[6] Natalie Thomas, "In rare British mass shooting, gunman kills five, including 3-year-old girl," Reuters.com, available at https://www.reuters.com/world/uk/british-shooter-named-jake-davison-2021-08-13/ (last visited Apr. 2, 2022).

down the street from Victim-3's family's home)).  The defendant's hand-written note read as

follows:

> Open up, Read Me.   For [Victim-3].   Bomb in mailbox.   From Big Man.
> I will rape you till you cry at my house.   [Certain address] in P-Ville.   Fuck
> you.   I'm going to tear your skin off and rape your face open stupid whore!!!
> And the next time it will be a BOMB!!   Cunt I will rape you endlessly.
> Your [sic] going to die.

(*Id.* ¶ 32(c)).  Images of the defendant's note are below:





After being advised of his *Miranda* rights, on July 13, 2020, the defendant was interviewed by local law enforcement and admitted that he had written the above note and left it in Victim-3's mailbox.  (*Id.* ¶ 32; Ex. E at 2).  Consistent with Incel ideology, the defendant explained that he had done so because, in sum and substance, Victim-3 was a young, attractive female whom the defendant believed would not give him the attention he deserved.  (PSR ¶ 32; Ex. E at 2).

**B.     Late February 2019: The Defendant Harasses Victim-6**

Beginning in or about late February 2019, the defendant began to harass a young woman (Victim-6) by text message.  (Ex. D).  After Victim-6 declined to accept the defendant's invitation for a date, he wrote: "FUCK U STUPID WHORE!!!" and repeatedly sent her messages to which she did not respond.  (*See id.*).  In or about April 2019, an officer of the Mt. Pleasant Police Department called the defendant, who confirmed that he did harass Victim-6.  The officer asked the defendant to stop all contact with Victim-6.  (*See id.*).

### C.      October 2019: The Defendant Begins to Threaten, Harass, and Stalk Victim-1, Victim-2, and Others

In or about October 2019, the defendant began a spree of stalking, threatening, and harassing two acquaintances from college who had tried to befriend the defendant (Victim-1 and Victim-2). (PSR ¶¶ 14-29; Exs. A, B). Victim-1 and Victim-2 are romantic partners and musicians/performers, and they both use social media professionally in order to advance their musical work and careers. (PSR ¶ 14; Exs. A, B). The defendant had studied music with Victim-1 and Victim-2, but had not been in touch from approximately 2014 to in or about October 2019. (PSR ¶ 14). The defendant began sending Victim-1, a woman, disturbing messages on Facebook, including messages about the defendant's identification as an Incel, hostile messages about Victim-1's recently deceased father, and false allegations that Victim-2 was beating Victim-1. (*Id.* ¶¶ 14-29; Exs. A, B). For example, the defendant commented on a post by Victim-1, stating, among other things:

> It goes to show that Chads like [Victim-2] can literally say ANYTHING and have everyone love them no matter what. While incels are FUCKED and have no one give a shit about them no matter how good their confidence or personality is . . . . And yes you don't Love [Victim-2] You're helplessly sexually attracted to his Chad face. And you can't bring yourself to admit that.

(PSR ¶ 16). On or about October 27, 2019, as a result of the defendant's harassment, Victim-1 blocked the defendant from accessing certain of her social media accounts. (*Id.* ¶ 17). In response, the defendant became enraged and began stalking Victim-1, Victim-2, and their friends. (*Id.* ¶¶ 18-29, 32).

From approximately October 2019 to August 2020, the defendant created and used approximately 50 social media accounts to stalk and harass the Victims. (*Id.* ¶¶ 18-29, 32). Beginning in or about June 2020, the defendant also attempted to impersonate Victim-1 and

Victim-2 online by creating social media accounts in their names.  The defendant's identity theft and online impersonation of Victim-1 and Victim-2 was significant because, as noted above, Victim-1 and Victim-2 use social media and the Internet in order to promote and advance their musical careers.  (Exs. A, B).  For example:

- In or about March 2020, the defendant, using a certain Instagram account, posted the following public comment on a picture posted by a female friend of Victim-1 and Victim-2: "Women should be hanged for saying 'no.'"

- On or about April 26, 2020, the defendant exchanged the following Facebook messages with a female friend of Victim-1 ("Victim-4"):

  | Kaufman: | Fuck you bitch |
  | | You know what you are |
  | | Fucken whore |
  | | Women shouldn't reject me so Goddam much |
  | | They won't give me the time of fucken day |
  | | It should be illegal for a woman to say no |
  | | I'll have sex with a woman one day.   One way or another [wink emoji]. |
  | | |
  | Victim-4: | Like the one that you paid for? |
  | | |
  | Kaufman: | Well there is that, and then there is the other way. |
  | | |
  | Victim-4: | So, rape.   You're talking about rape. |
  | | |
  | Kaufman: | Haha |
  | | They won't ever say yes, let's put it that way. |

  (PSR ¶ 18).

- In or about June 2020, the defendant created a Twitter account using Victim-2's first and last names.  With this account, the defendant sent sexually explicit and violent messages, holding himself out as Victim-2.   For example, on or about June 20, 2020, the defendant, using a Twitter account with user name "[Victim-2's first name][Victim-2's last name]3", publicly posted the following message addressed to a friend of Victim-1 and Victim-2: "Can I pinch your nose while I hardcore fuck ur face so you can't breathe?"

- On or about June 24, 2020, the defendant, using a Twitter account with user name "John Morray," sent Victim-1 the following message:  "Hey wanna hear a joke?  What's worse than 10 Stacy's nailed to one tree?  One Stacy nailed to ten trees [laughing crying face emoji]."  (*Id.* ¶ 19).

- On or about June 29, 2020, the defendant sent a series of messages to Victim-2 by phone. The defendant initially identified himself as "David Khalifa," and then revealed his true identity. These messages included a purported image of one of Elliot Rodger's victims, a deceased female who had been stabbed to death, accompanied by the following message: "This is what happened when a woman said 'no' to Elliot Rodger . . . . Hopefully [Victim-1] never said no to someone just like Elliot Rodger." A screenshot of a portion of the defendant's text messages is below:



(*Id.* ¶ 20).

In addition, the defendant publicly posted the following a photograph of himself online of him smiling and holding what appear to be two guns and a banjo, and standing alongside two other individuals holding what appear to be rifles.[7]



### D.   June 29 and July 1, 2020: Local Law Enforcement Repeatedly Ask the Defendant to Stop Contacting the Victims—To No Avail

After the defendant's June 29, 2020, death threat, on or about June 30 and on or about July 1, 2020, an officer of the Stamford Police Department ("SPD") called the defendant by phone and asked him to stop harassing Victim-1 and Victim-2.  (PSR ¶ 30).  The defendant told the SPD officer that he would stop harassing Victim-1 and Victim-2.  (*Id.*).

On or about July 1, 2020, an officer of the New York State Police ("NYSP") spoke with the defendant at his parents' home (the Kaufman Residence), where he resided at the time.  (*Id.* ¶ 31).  The NYSP officer asked the defendant about his messages with Victim-1 and Victim-2 and

---

[7] The FBI believes that Kaufman is holding Airsoft or "BB" guns.

asked the defendant to stop messaging them.  (*Id.*).  The defendant told the NYSP officer that he

would stop contacting Victim-1 and Victim-2.  (*Id.*).

> ### E.     July 2020: The Defendant Continues to Harass, Threaten, and Stalk the Victims

Despite the defendant's promises to local law enforcement on at least three occasions, the

defendant continued to stalk, threaten, and harass the Victims.  For example:

- In or about July 2020, the defendant posted the following messages on Twitter, referring to himself as "Big Man" and referencing his promise to law enforcement to cease contact with Victim-1: "I may not be able to talk to [Victim-1's First Name], but at least I can jerk off to her insta pics" and "Don't piss off BIG MAN" and "When [Victim-1's First Name] and I are dead, we'll be in heaven together forever."  (PSR ¶ 21).

- In or about July 2020, the defendant created an Instagram account using Victim-1's first and last names and photograph.  With this account, the defendant began sending messages to Victim-1's friends, holding himself out as Victim-2.  In one message, the defendant, claiming to be Victim-1, alleged that Victim-2 was beating Victim-1.  (*Id.* ¶ 16).

- On or about July 8, 2020, the defendant publicly posted the following response to a post by a friend of Victim-1 and Victim-2:  "[Victim-1] unfortunately never cared at all about me and just took advantage of my suffering for a moral high.  I guess I'll just have to move on and focus on my dream of becoming an expert hunter . . . it sure is a good thing the second amendment exists [smiley face]."  (*Id.* ¶ 22).

- On or about July 8, 2020, the defendant, using a certain Twitter account, posted the following message addressed to a female friend of Victim-1 and Victim-2 ("Victim-5"): "Big man LOVES the second amendment [smiley face] . . . My dream is to become an expert at hunting . . . ."  (*Id.* ¶ 22).

- On or about July 9, 2020, the defendant, using a certain Twitter account, posted the following message addressed to Victim-5: "One day I wanna teach people what the second amendment is all about [smiley face]."  (*Id.* ¶ 24).

- On or about July 11, 2020, the defendant, using a Twitter account with user name "[Victim-2's Name]Beat[Victim-1's Name] Hard" (*e.g.*, JohnBeatJaneHard, where John and Jane are substitutes for the names of Victim-2 and Victim-1), sent the following message to Victim-1: "Women have done nothing but spit in my face.  Soon I'll be getting a gun."  (*Id.* ¶ 23).

- On or about July 13, 2020, the defendant, using a Twitter account with user name "[Victim-1] GagsHard" (*e.g.*, JaneGagsHard), sent the following private message to a female friend

of Victim-1 and Victim-2:  "Can u come over to my house so that we can smash? . . . Someone should teach those shits what the second amendment is all about."  (*Id.* ¶ 24).

**F.      July 13 and 14, 2020: The Defendant Is Arrested on State Charges and the State Court Issues an Order of Protection for the Victims**

As discussed above, on or about July 13, 2020, the defendant waived his *Miranda* rights and spoke with local law enforcement.  The defendant admitted to stalking, threatening, and harassing the Victims and self-identified as an Incel.  (PSR ¶ 32).  The defendant admitted that he wanted to harm the Victims by "instill[ing] fear in [them]."  (Ex. E at 2).  The defendant was self-admitted to the Westchester Medical Center's Emergency Department for a mental health review.  (*Id.*).  The facility released him shortly after arriving and advised that the defendant's problems were not manic and they could not treat him.  (*Id.*).

On or about July 14, 2020, the defendant was arrested and charged in the Town of Cortlandt Justice Court in Westchester County, New York, in connection with his threats, harassment, and stalking.  (*Id.* ¶ 34).  Specifically, the defendant was charged with two counts of aggravated harassment in the second degree, in violation of New York Penal Law § 240.30; and one count of identity theft in the third degree, in violation of New York Penal Law § 190.78.  That same day, the presiding state court judge issued an order of protection ordering the defendant to, among other things: stay away from Victim-1, Victim-2, and Victim-3; refrain from communication or any other contact with Victim-1, Victim-2, and Victim-3; and refrain from harassing, intimidating, threatening or otherwise interfering with Victim-1, Victim-2, and Victim-3.  (*Id.*).  With the court orders of protection in place, the court released the defendant on bail.

### G.     July 13 through September 4, 2020: The Defendant Violates the State Court's Order While on Bail by Harassing and Stalking the Victims—and by Starting to Plan a Violent Attack

Despite the state criminal charges, the terms of the defendant's pretrial supervision, the state court order of protection, and multiple requests from local law enforcement, the defendant continued to stalk and harass the Victims.  (PSR ¶ 34).  In addition, the defendant escalated his conduct by conducting surveillance of Victim-1 and identifying ways to illegally purchase a gun and make a semi-automatic rifle.  (*Id.*).  For example, after the defendant was criminally charged, and in violation of the state court order of protection, the defendant committed the following acts:

- Between on or about July 14 and September 14, 2020, the defendant searched online for Victim-1's social media accounts at least 74 times.  (PSR ¶ 34).

- On or about July 14, 2020, the day the defendant appeared in state court and the order of protection was issued, the defendant conducted online searches for Victim-1 and Victim-2.

- On or about July 15, 2020, the day after the defendant appeared in state court and the order of protection was issued, the defendant conducted online searches for Victim-1 and Victim-3.

- On or about July 26, 2020, the defendant watched several Elliot Rodger videos on YouTube.

- On or about July 30, 2020, two weeks after the defendant's state arrest, the defendant conducted online searches for Victim-1's address, including searches of Victim-1's parents and the town in which Victim-1 resided.  The defendant conducted surveillance of Victim-1's residence online.  (*Id.*).

- In or about August 2020, the defendant created a Twitter account and uploaded a profile picture of himself licking a photograph of Victim-1.  (*Id.* ¶ 29).

- On or about August 2, 2020, the defendant sent the following message to a female friend of Victim-1 and Victim-2:  "Death is good[.]   Not all heroes wear capes.  Sometimes, they wear shirts over their face.   Fun fact!  I know where you live . . . "  (*Id.* ¶ 28).[8]

---

[8] As an employee of the U.S. Postal Service, it is possible that the defendant may have had access to victim home addresses.

- On or about August 17, 2020, the defendant again searched for Victim-1's address online, and saved a photograph of Victim-1's home onto his cellphone. (*Id.* ¶ 34).

- On or about August 19, 2020, the defendant, using a TikTok account, "liked" two of Victim-2's video posts. (*Id.*).

- In or about August 2020, the defendant conducted online research as to how to illegally purchase a gun and assemble a semi-automatic rifle. (*Id.*). Specifically, on or about August 21, 2020, the defendant searched online for "How to make a semi-automatic rifle." (*Id.*). On or about August 22, 2020, the defendant searched for "how to stop a Bad guy with a gun?" On or about August 30, 2020, the defendant searched online for "How to get gun illegally." (*Id.*).

- Up until the date of his federal arrest on or about September 4, 2020, the defendant consumed Incel propaganda online, including YouTube videos of Elliot Rodger, and he searched for Victim-1's social media accounts online.

### III.    The Defendant's Federal Arrest and Guilty Plea

On or about September 3, 2020, the defendant was charged by Complaint No. Mag. 9448, with sending threatening interstate communications, in violation of 18 U.S.C. §§ 875(c) and 2, and stalking, in violation of 18 U.S.C. §§ 2261A, 2266, and 2. (Dkt. 2). The defendant was arrested the following day, on September 4, 2020. (Dkt. 5). On or about October 26, 2020, the defendant was charged in Indictment No. 20 Cr. 577 (NSR) with the above offenses. (Dkt. 9).

On or about December 15, 2021, the defendant pleaded guilty, pursuant to a plea agreement with the Government (the "Plea Agreement"), to stalking Victim-1, Victim-2, and others from in or about October 2019 up to and including in or about August 2020, as charged in Count Two of the Indictment. (PSR ¶ 5). Pursuant to the Plea Agreement, the defendant agreed that the applicable Guidelines range was 30 to 37 months' imprisonment (the "Stipulated Guidelines Range"). (*Id.* ¶ 6). The defendant also agreed to pay restitution in the amount of $1,404.40 to Victim-1 and Victim-3. (*Id.*). Finally, among other things, the defendant agreed to "stay at least 100 yards away from the [Victims]"; to "stay at least 100 yards away from the home, school, business, and place of employment of the Victims"; to "refrain from having any communication

or any other contact, directly or through another person . . . with the Victims"; and to "refrain from harassing, intimidating, threatening, or otherwise interfering with the Victims and members of the Victims' households" (the "Orders of Protection").  (*Id.*).[9]

## IV.  The Harms of Stalking to Victims and to the Public

### A.  Background

The crime of stalking is a serious offense that has profound consequences for victims and for the public.  Stalking is about a defendant's exertion of power and control over his victims, and it is a crime that disproportionately harms and affects women.[10]

"Being stalked, and suffering the fear and threats that characterize the crime" is significantly correlated with symptoms of post-traumatic stress disorder ("PTSD") and psychological distress.[11]  Specifically, for victims, stalking typically causes health problems, including higher levels of fear, distress, anxiety, PTSD, depression, and insomnia.[12]  Stalking also

---

[9] The defendant's Guidelines range would have been the same had he pleaded guilty to both Counts One and Two of the Indictment because the counts would have been grouped under U.S.S.G. § 3D1.2.

[10] *See* U.S. Department of Justice, Office on Violence Against Women, "2014 Report to Congress" at 2 (Jan. 2017), available at https://www.justice.gov/ovw/page/file/932736/download (last visited Apr. 10, 2022) (hereinafter "DOJ, Report to Congress") (noting that 1 in 7 U.S. women and 1 in 19 U.S. men have experienced stalking in their lifetimes, and the most common relationship between victim and stalking perpetrator is that of current or former intimate partner); *see also* National Coalition Against Domestic Violence, "What is Stalking?", available at https://ncadv.org/files/Domestic%20Violence%20and%20Stalking%20NCADV.pdf (last visited Apr. 10, 2022) (hereinafter "NCADV, Stalking") (same, but noting 1 in 6 U.S. women have experienced stalking in their lifetimes).

[11] DOJ, Report to Congress at 4.

[12] *See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Intimate Partner Stalking: Fear, Psychological Distress and Health Impacts," available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/fear-distress-health.aspx (last visited Apr. 10, 2022) (hereinafter "DOJ, Impacts"); *see also* NCADV, Stalking (describing the impact of stalking on victims, which can include the need to relocate, losing work or missing work days, depression, anxiety, insomnia, social dysfunction, post-traumatic stress disorder, suicide).

can cause significant economic harms, including loss of time from work, loss of a job or job opportunities, the inability to take advantage of employment opportunities, reduced productivity or job performance, the need to change residencies, legal fees, and health and mental treatment.[13] In addition, while stalking is typically a more "psychological" than "physical" offense, studies have indicated that an individual who stalks a victim is more likely to harm the victim.[14]

For the public, stalking produces significant harms. Researchers estimate that stalking can cost upwards of $342 million in 2003 dollars for lost productivity and mental health care costs— and that this amount is likely a significant underestimate of the costs of stalking.[15] In addition, it is widely accepted that stalking is connected to other forms of violence against women, including domestic violence, physical and sexual assault, and murder.[16]

---

[13] *See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Intimate Partner Stalking: Economic Harm Caused," available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/economic-harm.aspx (last visited Apr. 10, 2022) (hereinafter "DOJ, Economic Harm"); DOJ, Report to Congress at 5.

[14] *See, e.g.*, DOJ, Health Impacts; U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Intimate Partner Stalking: Duration and Trajectory," available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/duration.aspx (last visited Apr. 10, 2022); U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Comparing the Danger Posed by Partner Stalkers Versus Non-Partner Stalkers," available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/partner-nonpartner.aspx (last visited Apr. 10, 2022); U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Comparing Abusive Partners Who Do and Do Not Stalk," available at https://www.nij.gov/topics/crime/intimate-partner-violence/stalking/Pages/stalkers-nonstalkers.aspx (last visited Apr. 10, 2022); *see also* DOJ, Report to Congress at 4 (describing the "numerous tangible and intangible costs" of stalking).

[15] *See* DOJ, Economic Harm.

[16] *See, e.g.*, DOJ, Report to Congress at 3 (noting that of female victims who were physically assaulted by their violent partners in the preceding year, 90 percent were stalked by that partner, and of women murdered by their former or current partners, 54 percent had reported stalking to the police before they were killed); NCADV, Stalking (noting that stalking is about power, intimidation, and control, and 81 percent of women who were stalked by a current or former husband or cohabiting partners were also physically assaulted by that partner and 31 percent of

Despite the harms caused by stalking to both individual victims and to the public, stalking is an offense that has historically remained underreported and underprosecuted.[17]   Such underreporting is a result of, among other things, inadequate protections for stalking victims, a belief that the police cannot or will not do anything, fear that victims will not be believed, fear of the perpetrator, not having proof of the stalking (particularly in cases of physical stalking), and fearing that the crime will not be taken seriously.[18]

**B.      The Impact and Harm Caused by the Defendant's Crimes**

Each of the Victims has been profoundly affected by the defendant's crimes.  As noted above, Victim-1, Victim-2, and Victim-3 plan to appear at sentencing and speak at the proceeding. The significant harms that they have suffered—and continue to suffer—are described below.

**Victim-1.**  Victim-1 has been profoundly affected by the defendant's stalking, harassment, and death threats.  (Ex. A).  Victim-1 lives in constant fear because of the defendant.  (*Id.*).  She suffers from PTSD, anxiety, and depression, and feels that she is now "a completely different person" because of the defendant's conduct.  (*Id.*).  Whenever she enters a building, she is "constantly checking all exit points" because she is terrified that the defendant may harm her.  (*Id.*). Wherever she walks, she is constantly checking behind her back to see if she is being followed or in harm's way.  (*Id.*).  She is unable to sleep without nightmares.  (*Id.*).  As a professional musician and performer, Victim-1 now feels "terror and dread" when she is on stage.  (*Id.*).  An excerpt from Victim-1's statement is below:

---

women were sexually assaulted) (also noting that 76 percent of women murdered by an intimate partner were stalked first and 85 percent of women who survived murder attempts were stalked).

[17] DOJ, Report to Congress at 5-6 (noting that the rates of reporting for stalking crimes are anywhere between 17 and 41 percent).

[18] *See, e.g.*, DOJ, Report to Congress at 5; NCADV, Stalking.

> Loud noises send me into an intense panic attack wondering if David has found me and this will have been my last day on earth. I am always triple checking that every door in my home has been locked, trying to come up with an exit strategy on how to hide with my disabled mother in case he finds my home and makes good on his threat to burn my house down with him, and me in it.

(*Id.*).

Victim-1 was "relieved" when the defendant was detained in connection with this case, and is "nervous" that the defendant's harassment will continue once he is released into the community. (PSR ¶ 39). She believes that the defendant should receive the "maximum sentence" possible for his conduct. (*Id.*; Ex. A).

**Victim-2.** Victim-2 has also been "severely impacted" by the defendant's criminal conduct. (Ex. B). Various aspects of Victim-2's life have changed because of the defendant's crimes. (*Id.*). Professionally, as a musician, it is important for Victim-2 to promote himself in public forums and online and to physically perform in public. (*Id.*). The defendant's harassment and threats have limited Victim-2's ability to advance his career by promoting himself online because he is afraid of what the defendant may do. (*Id.*). Personally, Victim-2 has become increasingly private and afraid to trust and meet new people. (*Id.*). He has become paranoid, he has frequent nightmares, and panic attacks. (*Id.*). In addition to Victim-2, Victim-2's family has also been impacted by the defendant's conduct. "They have been worried about [the defendant] stalking and appearing at night." (Ex. B). They are afraid that the defendant may continue to impersonate them online. (*Id.*).

Victim-2 fears the defendant's release into the community. (PSR ¶ 40; Ex. B). He "do[es] not feel like this will be the end" and he does not "feel like [the defendant] has any remorse for the pain that he caused." (Ex. B). Before the defendant's arrest, he felt that the defendant was

"planning something." (PSR ¶ 40). He believes that the defendant should receive the maximum possible sentence. (*Id.*).

> **Victim-3.** Victim-3 has been significantly impacted by the defendant's bomb, death, and rape threat. As stated in her statement, "February 9, 2019 was a day that I will never forget." (Ex. C). When she read the defendant's violent threats, Victim-3 "began shaking" and "dropped to the floor" with "[t]ears rolling down [her] face." (*Id.*). She did not sleep for a day, and her life was altered substantially. (*Id.*). She "lived in a constant state of fear" with "[e]very blind in my house . . . always down." (*Id.*). She traveled with pepper spray, her family installed surveillance cameras across her home. (*Id.*). She was so afraid that she had to find an escort to walk with her to and from her car each day. (*Id.*). Even after Victim-3 moved, she was affected by the defendant's threats. (*Id.*). She was and is limited in what she can post online and she lives in "constant fear." (*Id.*). She felt some semblance of safety when the defendant was arrested and detained in connection with this case—but she fears the defendant's release into the community. (*See id.*). She believes the defendant should receive the "maximum sente[nce] possible" for his conduct to ensure the safety of the community. (*Id.*).

## V.  The Probation Office Recommends a Sentence of 30 Months' Imprisonment

The Probation Office recommends a sentence of 30 months' imprisonment to be followed by three years' supervised release. (PSR at 21). This recommendation is based on: the likelihood that the defendant was preparing to commit an act of violence; the defendant's escalation of his criminal conduct despite "numerous attempts by law enforcement and the Courts to prevent it"; the significant effects of the defendant's conduct on the Victims; and the fear and anxiety of the Victims over the defendant's release into the community, particularly given that the defendant was

not previously deterred by law enforcement, criminal charges, or a court order of protection.  (*Id.* at 21-22).

## **DISCUSSION**

A sentence at the top of the Guidelines range is warranted for this defendant.  The time-served sentence requested by the defendant is utterly divorced from the reality of the facts and circumstances of this case, and would be woefully inadequate.  Such a sentence would fail to adequately account for the interests of justice, the Victims, and the public.  It would release a potentially violent and volatile Incel into the community while sending a message that perpetrators of threats and violence against women will not be held fully accountable for their crimes.

For the reasons discussed below, a sentence at the top of the applicable Guidelines range is warranted and necessary in light of (1) the history and characteristics of the defendant; and in order to (2) reflect the nature of the defendant's conduct and to provide just punishment, (3) protect the Victims and the public from future crimes of the defendant, (4) deter the defendant from continuing to harass and stalk the Victims and others, and (5) promote respect for the laws prohibiting stalking and crimes of violence against women and deter individuals similarly situated to the defendant, including other Incel adherents from committing such crimes.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(C).  The Government also submits that the defendant's incarceratory term should be followed by three years of supervised release, with the Orders of Protection as special conditions.

**The History and Characteristics of the Defendant.**   The defendant's submission dramatically overstates his asserted cognitive deficits and attempts to exploit his history of depression and other mental health issues.  In actuality, the defendant is a nearly 30-year-old man who received both high school and college degrees and lives an upper-middle-class lifestyle.  (PSR

¶¶ 64-66). ████████████████████████████████████████████████

████████████████████████████████ He has been afforded privilege after privilege and

opportunity after opportunity to abide by the law and contribute to society.  His attempts to paint

himself as an immature child who is a victim of his own mental health should be rejected by this

Court.



 Moreover, as discussed below, the defendant did not commit his crimes in passing; his conduct was calculated, sophisticated, and unrelenting.

Second, the defendant's asserted mental health issues do not justify a time-served sentence with out-patient treatment.  Out-patient treatment has already failed to prevent the defendant from

---

[20] The defendant's parents both overcame their delayed speech and have successful careers in business and medicine.  (PSR ¶ 64).

[21] The Government has redacted the above portion of this sentencing submission and is prepared to discuss such redactions at sentencing.

committing crimes.  Indeed, the defendant benefitted from out-patient mental health treatment for years—at least since high school and certainly while he was committing the offense conduct—to no avail.  (Def. Ex. C).  He is also currently prescribed the same medication that he was prescribed while he stalked the Victims and violated court orders.  (*Id.*; PSR ¶ 78).  The defendant, moreover, does not appear to be wholly committed to treatment.  He has started and stopped treatment multiple times.  (PSR ¶¶ 76-77).  And his out-patient psychiatrist offers a lukewarm assessment that the defendant has "some desire" to "right his situation", while suggesting that the defendant may have been noncompliant in taking his medication.  (Ex. C).

Third, according to the defendant's own psychiatrists, he continues to harbor deep resentment and hostility against women—consistent with Incel ideology—and poses an ongoing danger to the community and to the Victims, as discussed in greater detail below.  (*See infra* at 25-26) (citing Def. Exs. C-E)).

**Just Punishment and the Serious Nature of the Defendant's Criminal Conduct.**  The defendant terrorized multiple victims with threats of rape, violence, shooting, hanging, nailing, torture, and death.  He acted deliberately, meticulously, and relentlessly over more than one year— stalking his targets and harassing and threatening them in numerous ways.  He terrorized them online through endless threats, he terrorized their friends and family, he impersonated them, and he tried to ruin their personal and professional reputations.  He was not deterred by numerous law enforcement interventions warning him to stop harassing women and to cease contact with the Victims.  He was not deterred by state criminal charges and an arrest.  He was not deterred by a court order.  In fact, even after he was criminal charged and ordered to stop stalking and contacting the Victims, he continued his harassment and began planning to attack Victim-1 by conducting surveillance on her and looking for a gun or rifle.  The defendant did not stop his stalking or attack

planning voluntarily.  He only stopped when he was federally arrested and detained in connection with this case.[22]

Stalking, as discussed above, is a serious offense.  It profoundly affects victims' lives, placing them in constant fear for their safety and security.  Here, the defendant's conduct has profoundly impacted the Victims.  Their lives have been completely altered.  They—and their families—have been living in fear since 2019.  (*See* Exs. A-C).  They have installed surveillance cameras (Ex. C), they are constantly looking behind their shoulders (Exs. A-C), they suffer from PTSD, anxiety, depression, and other forms of trauma (*id.*).  They cannot live public lives.  (Exs. A, B).  They are afraid to perform as musicians and as actors.  (*Id.*).  They have been unable to live freely because of the defendant.  (Exs. A-C).  This trauma and fear will only be exacerbated when the defendant is out in the community, living just down the street from Victim-3.

Victim-1, Victim-2, and Victim-3 respectfully ask the Court to impose the maximum sentence possible on the defendant.  Such a sentence, in their minds, would enable them to live one more day without immense fear that the defendant will hurt them.  Indeed, in other stalking cases, courts have imposed significant sentences.  *See, e.g.*, *United States v. Yilmaz*, 910 F.3d 686, 689 (2d Cir. 2018) (upholding 37-month sentence imposed by the Honorable Edgardo Ramos, U.S. District Judge for the Southern District of New York, where defendant sent thousands of emails to the victim, as well as the victim's family, friends, professors, and co-workers, and "destructively impacted her private and professional life"); *United States v. Lee*, 790 F.3d 12, 13-15 (1st Cir. 2015) (upholding 100-month sentence where defendant sent estranged wife 300 emails, including some threats, in addition to other violent conduct).

---

[22] The defendant claims that he "never took any substantial steps . . . to carry out violence against other people."  (Def. Mem. at 9-10).  That assertion is factually belied by the record.

**The Need to Protect the Victims and the Public from Harm and Future Crimes of the Defendant.** The defendant continues to pose a real and serious danger to the community and to the Victims. According to his own psychiatrists, the defendant continues to adhere to Incel ideology and holds the same resentments, frustration, and hostility against women that inspired his crimes. That is, the defendant is a "very troubled man" who has "developed a rigid irrational belief system." (Def. Ex. C). The defendant continues to harbor hostility against women, and his medication has "not dissipated nor offset the [defendant's] active aggressive fantasy life." (Def. Ex. E at 2). His symptoms have "persisted in varying severity" over time, and he is "quick to harbor strong feelings of resentment as a result of perceived slights and insults." (Def. Ex. D at 2). The defendant is "likely to be extremely sensitive in social interactions and very quick to perceive rejection (real or imagined) by others." (*Id.*). The defendant's "combination of impulsivity, anger, and dysphoria could place [him] at increased risk for self-harm or acting out behaviors," including harming others. (*Id.*). The defendant thus continues to pose a real risk of danger to the community. In addition to the risk of a potential assault or violent attack, the defendant's early release into the community will also cause significant harm to the Victims. That is, each day that the defendant is incarcerated allows the Victims to rebuild their lives with some semblance of safety and security and without the fear and terror that they will be further victimized by the defendant.

Notably, the defendant has expressed no remorse for his conduct. Nor does he address the harm that he has caused, any measures to ensure the safety of the community, or his likelihood of recidivism. Not once in his sentencing submission does he address his self-identification as an Incel. Rather, the defendant himself admits that he has an "inability to understand why his behavior is so serious." (Def. Mem. at 9). Instead of taking responsibility, the defendant deflects

blame onto his asserted boyishness, immaturity, low self-esteem, and depression, and utterly fails to account for the safety of others.

Out-patient therapy, moreover, has already proven inadequate in ensuring the safety of the community. Neither the defendant's therapists nor his parents can guarantee that the defendant will not commit additional crimes. Nor are therapists or family members adequately equipped to manage the defendant's volatility, rage, and violence. As discussed above, the defendant was already receiving out-patient therapy and living with his family when he committed the above crimes and up until the time of his arrest. His parents and therapists were well-aware of his criminal conduct (PSR ¶ 38), and decided that it was a "good idea" for the defendant to live alone for the approximately two months prior to his arrest (PSR ¶ 71), during which time he began to plan a violent attack of Victim-1. Moreover, according to the defendant's father, there are at least two rifles present in the Kaufman Residence. (Ex. E at 2). The defendant's parents did not notify Probation of these firearms at the time of the home inspection. (PSR ¶ 70).[23]

By all accounts, the defendant continues to pose a danger to the community that cannot be mitigated by living with his parents or obtaining out-patient treatment. The Court cannot be assured that the defendant, upon release, will not harm the Victims or others. The defendant should not be afforded yet another opportunity at the expense of the Victims' safety and security.

**The Need to Deter the Defendant from Continuing to Harass, Threaten, and Stalk the Victims and Others.** The defendant has been given numerous opportunities to abide by the law and he has repeatedly flouted law enforcement warnings and court orders. In early 2019, the defendant was told by law enforcement to stop contacting Victim-6. In June and July 2020, the

---

[23] The defendant has agreed to the Orders of Protection as special conditions to any term of supervised release.

defendant was told by law enforcement to stop contacting Victim-1 and Victim-2. The defendant rebuffed law enforcement interventions and continued threatening, harassing, and stalking the Victims. The defendant did so even after he was arrested on state criminal charges and placed on pretrial supervision in August 2020. He even went so far as to violate a court order of protection by continuing to contact Victim-1 and continuing to stalk Victim-1, Victim-2, and Victim-3. In fact, his response to the court order was to escalate his conduct by conducting surveillance of Victim-1 and researching how to illegally obtain and use a gun and a semi-automatic rifle.

The defendant remained undeterred by all law enforcement efforts until he was federally arrested in this case. Even now, the defendant admits that he does not "understand why his behavior is so serious." (Def. Mem. at 9). The need for specific deterrence thus warrants a significant sentence in this case.

**The Need to Promote Respect for the Law and to Deter Similarly Situated Individuals, Including Other Incels.** The Court's sentence in this case is of particular interest to the public. As discussed above, Incels are a growing group of violent extremists, and stalking crimes are often disregarded or not afforded sufficient significance. The Court has the opportunity in this case to send a message to the Incel movement, to perpetrators of stalking, and to others similarly situated that they will be held accountable for crimes of violence against women—and that they cannot simply deflect responsibility onto claims of immaturity, boyishness, or depression. It is also important for the Court to send a message to victims that the Court will protect the public and take these crimes seriously.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence at the top of the applicable Guidelines range is warranted and necessary in this case.

Dated:   New York, New York
April 11, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/
Jane Kim
Assistant United States Attorney
(212) 637-2038