```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                              Case No. 20-cr-577(NSR)
 5       -vs-

 6  DAVID KAUFMAN,

 7                            Defendant.

 8  ------------------------------------x

 9                              United States Courthouse
                                White Plains, New York
10
                                April 14, 2022
11                              11:51 a.m.

12  B e f o r e:

13                              HONORABLE NELSON S. ROMÁN

14                              United States District Judge

15
    A P P E A R A N C E S:
16
    DAMIAN WILLIAMS
17       United States Attorney for the
         Southern District of New York
18  JANE KIM
         Assistant United States Attorney
19

20  HODGES, WALSH &  BURKE
    MICHAEL K. BURKE
21       Attorney for Defendant

22

23

24

25
```

1          THE DEPUTY CLERK:  This is the proceeding in criminal

2    matter 20-cr-577, United States of America against David

3    Kaufman.

4          Counsel, please state your appearances for the record.

5          MS. KIM:  Good afternoon, Your Honor.  Jane Kim for

6    the government.

7          MR. BURKE:  Good afternoon, Your Honor.  Michael

8    Burke, Hodges, Walsh & Burke on behalf of David Kaufman.

9          THE COURT:  Good morning, everyone.  I am going to ask

10   everybody to remain seated throughout this proceeding.  Make

11   sure you have the microphones in front of you so that the court

12   reporter can memorialize everything that's said here today.

13         Under normal circumstances, I understand you would be

14   rising when you address the Court.  I know it's out of respect,

15   but I think in order to continue to comply with social

16   distancing protocols in light of the Covid-19 pandemic, I am

17   going to ask everyone to remain seated.  It minimizes movement.

18         This is a proceeding in the matter of United States

19   versus David Kaufman, docket number 21-cr-518.  It is intended

20   to be the sentencing of the defendant.  Both counsels have given

21   their appearances on the record, and the record should reflect

22   that the defendant, David Kaufman, is present in the courtroom

23   and seated next to counsel.

24         Before I proceed with the sentencing portion of this

25   hearing, the parties have provided the Court with a signed

1  Consent Order of Restitution and a signed Consent Protective

2  Order.

3          Mr. Kaufman, I am going to ask you a few questions

4  before we get to the sentencing.  All right.  I have before me a

5  Consent Order of Restitution.  Did you review the Consent Order

6  of Restitution with the assistance of your attorney?

7          THE DEFENDANT:  Yes.  That's correct.

8          THE COURT:  Do you understand that you have agreed to

9  pay a sum of money or sums of money as restitution to the

10  victims in this case?

11          THE DEFENDANT:  Yes.

12          THE COURT:  All right.  When you went over the

13  document with your attorney, did you understand everything that

14  the document contained?

15          THE DEFENDANT:  Yes, I did.

16          THE COURT:  And did your attorney answer all the

17  questions --

18          THE DEFENDANT:  Yes, he did.

19          THE COURT:  -- that you had with respect to this

20  document?

21          THE DEFENDANT:  Yes.

22          THE COURT:  All right.  Did you sign this document

23  voluntarily and of your own free will?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.  The record should reflect that

1    the Order of Restitution was sent, or Consent Order of

2    Restitution has been so ordered by the Court, and it's marked

3    actually as Court Exhibit Number 2.  All right?

4              Mr. Kaufman, I also have before me -- let me go back

5    to the Consent Order of Restitution.

6              Mr. Burke, did you review the Consent Order of

7    Restitution with your attorney -- I mean with your client?

8              MR. BURKE:  I did, Your Honor.

9              THE COURT:  All right.  And based on your discussions

10   with him, do you believe that he understood the terms of the

11   Consent Order of Restitution?

12             MR. BURKE:  Yes, Your Honor.

13             THE COURT:  All right.  Let's move on to the Consent

14   Order of Protection.

15             All right.  Mr. Kaufman, did you review the Consent

16   Order of Protection?

17             THE DEFENDANT:  Yes, I did.

18             THE COURT:  Did you review it with the assistance of

19   your attorney?

20             THE DEFENDANT:  I did.

21             THE COURT:  And did your attorney answer any and all

22   questions that you had with respect to the Consent Order of

23   Protection?

24             THE DEFENDANT:  Yes.

25             THE COURT:  All right.  Did anyone force you to sign

1  this document?

2            THE DEFENDANT:  No.

3            THE COURT:  Did you sign this document freely and of

4  your own free will?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Do you understand that you have agreed to

7  stay at least 100 yards away from the victims listed in the

8  attachment that's referenced as Attachment A?  And in Attachment

9  A it references three victims, along with several family members

10  of the victims.  Do you understand that?

11            THE DEFENDANT:  Yes, I do.

12            THE COURT:  Do you also understand that you have

13  agreed to stay at least 100 yards away from the home, school,

14  business, and place of employment of the victims and the other

15  individuals named in the attachment?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Do you understand that you have agreed to

18  refrain from having any communication or any other contact

19  directly or through any other person by mail, telephone, email,

20  voicemail, social media or any other means with the victims and

21  the other individuals listed in Attachment A?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Do you also understand that you have

24  agreed to refrain from harassing, intimidating, threatening or

25  otherwise interfering with the victims and members of the

1  victims' household?  Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.  And you indicated that you

4  signed this document freely and of your own free will?

5          THE DEFENDANT:  Yes, I did.

6          THE COURT:  Okay.  Mr. Burke, did you review the

7  Consent Order of Protection with your client?

8          MR. BURKE:  I did.

9          THE COURT:  And based on your discussions with him, is

10 it your opinion that he understands fully all the terms

11 contained therein?

12         MR. BURKE:  Yes, Your Honor.

13         THE COURT:  All right.  So the record should reflect

14 that the Court has forwarded the Consent Order of Protection.

15 It should also -- it's also my understanding that there were two

16 additional victims in this case?

17         MS. KIM:  Yes, Your Honor.  Thank you for raising that

18 with the government.  There are potentially three additional

19 victims, and the government plans to reach out to those victims;

20 confirm that they are comfortable being listed on the

21 attachment, and then we will confer with defense counsel, and if

22 appropriate, file an amended Order of Protection.

23         THE COURT:  All right.  Mr. Burke, are you aware of

24 that?

25         MR. BURKE:  We did have those discussions, Your Honor.

1  And I am aware of it, and if they wish to be added, we will have

2  those discussions, Your Honor.

3          THE COURT:  Okay.  Let's now proceed to the portion

4  of --

5          (Pause)

6          THE COURT:  The record should reflect that the Consent

7  Order of Protection is marked as a Court exhibit, Court Exhibit

8  Number 1.  All right.

9          Let's proceed to the sentencing portion of the

10 hearing.  All right.  I have reviewed the presentence

11 investigation report filed March 7, 2022, which was prepared in

12 connection with today's sentencing of Mr. Kaufman; the

13 defendant's submission dated April 7, 2022; and the government's

14 submission dated April 12, 2022.

15         Ms. Kim, has the government reviewed the presentence

16 report?

17         MS. KIM:  Yes, Your Honor.

18         THE COURT:  And does the government have any

19 objections to the presentence report?

20         MS. KIM:  No, Your Honor.

21         THE COURT:  Mr. Burke, have you reviewed the

22 presentence report?

23         MR. BURKE:  Yes, Your Honor.

24         THE COURT:  Have you had the opportunity to discuss it

25 with your client, Mr. Kaufman?

```
1              MR. BURKE:  I have.

2              THE COURT:  Do you have any objections to the report

3  which you wish to raise on behalf of your client at this time?

4              MR. BURKE:  No, Your Honor.

5              THE COURT:  Mr. Kaufman, did you read and review the

6  presentence report?

7              THE DEFENDANT:  Yes, I did.

8              THE COURT:  And have you discussed it with your

9  attorney?

10             THE DEFENDANT:  I have.

11             THE COURT:  Mr. Kaufman, the Indictment, which was

12 docketed under ECF number 9, filed on October 26, 2020, charges

13 you with the following:  Count One, knowingly transmitting in

14 interstate and foreign commerce a communication containing a

15 threat to injure the person of another, in violation of Title 18

16 United States Code Sections 875(c) and 2.

17             Count Two, using the mail, any interactive computer

18 service or electronic communication service or electronic

19 communication system of interstate commerce, or any other

20 facility of interstate or foreign commerce, with the intent to

21 kill, injure, harass, and intimidate another person to engage in

22 a course of conduct that, A, placed that person in reasonable

23 fear of the death of, and serious bodily injury to, that person

24 and to that person's family member or intimate partner; and B,

25 caused, attempted to cause, and would be reasonably expected to
```

 1  cause substantial and emotional distress to that person, in

 2  violation of a temporary or permanent civil or criminal

 3  injunction, restraining order, no-contact order, or other order

 4  described in Title 18 United States Code Section 2226 in

 5  violation of Title 18 United States Code Sections 2264(a)(2)(A),

 6  2261(a)(2)(B), 2261(b)(6), 2226, and 2.

 7           On December 15, 2021, the defendant entered a plea to

 8  Count Two of the Indictment before this Court.

 9           Ms. Kim, does the government have any comments or

10  motions for the Court's consideration before I sentence the

11  defendant?

12           MS. KIM:  Yes, Your Honor.  Before I begin, I just

13  wanted to note for the Court, that Victim-1 and Victim-2 and

14  Victim-3 and their family members are present in the courtroom,

15  and Victim-1, Victim-2 and Victim-3 respectfully request to the

16  opportunity to be heard.

17           THE COURT:  So let's -- before you address the Court,

18  let's allow the victims to address the Court.

19           MS. KIM:  Certainly, Your Honor.  One question:  If

20  the victims come to the podium to speak, would you like them to

21  take their masks off or keep them on?

22           THE COURT:  Just hold on for a second.

23           (Discussion off the record)

24           THE COURT:  Was everybody able to hear that in the

25  audience?

1           MS. KIM:  One more test.

2           Your Honor, we would like to first start with Victim-3

3  if we could.

4           THE COURT:  All right.  So that's okay.  Is the filter

5  on?  Okay.  So I am going to ask as the -- when you are called

6  up to come forward, I am going to ask you to stand in front of

7  the podium with the microphone, and to speak directly into the

8  microphone that's at the podium.  You can take off your mask,

9  okay, but then once you leave or once you finish speaking, you

10 must put your mask back on.  All right?

11          MS. KIM:  Thank you, Your Honor.

12          THE COURT:  Hold on just a second.

13          (Pause)

14          THE COURT:  Let's have Victim Number 3.

15          MS. KIM:  Yes.

16          THE COURT:  You can come forward, and you can address

17 the Court.

18          VICTIM-3:  Good afternoon, Your Honor.  My name is

19 Alyssa Cascone, and I am joined here today by my loving parents

20 and my wonderful fiancé.

21          THE COURT:  I know that this is a difficult thing you

22 are doing.

23          VICTIM-3:  I got it.

24          THE COURT:  I'm just going to ask you to slow down,

25 and the reason for that is because everything that's said in

041422.2                          PROCEEDINGS                          11

1  court has to be memorialized.  So if you kind of rush through

2  it, it becomes difficult for Darby to kind of hear what you have

3  to say and memorialize your statement.  Okay?

4          VICTIM-3:  Got it.  I traveled nearly 300 miles to be

5  here in person to attempt to find closure in a two-year-long

6  nightmare my family and I were put in beginning in 2019.

7          February 9, 2019, was the day that I will never

8  forget.  At the time I was in graduate school preparing for my

9  professional license exam for my master's degree.  That Sunday

10 afternoon my dad came in from getting the mail looking confused

11 at what he had in his hand.  He asked my mom to meet him in the

12 kitchen, but there was an odd tone in his voice, one of terror

13 and fear, then true anger.  I then heard my mom gasping and

14 shrieking in disbelief.  As I read the piece of paper, I began

15 shaking, my knees weak as I dropped to the floor, tears rolling

16 down my face.  "I am going to tear your skin off and rape you,

17 you stupid whore.  Bomb in the mailbox.  Boom."  Written in all

18 caps accompanied by a smiley face.  "You are going to die."

19          These words still to this day ran in my mind.  I was

20 in a state of shock.  Who could do this?  Where did this come

21 from?  The most disturbing handwritten note addressed to me put

22 in my mailbox unprovoked.  I wouldn't sleep for 24 hours.  I

23 laid awake in my bed wondering if someone was peering in my

24 window, watching my every move, wondering if someone would break

25 into my house any minute armed and hurt me or my family.

1    Was there a bomb somewhere?  We didn't know, and truly
2  the only word I have to describe it is horrifying.  I lived in a
3  constant state of fear.  Every blind in my house was down.  I
4  traveled with pepper spray.  My family installed surveillance
5  cameras covering every inch of my house.  I checked my car daily
6  for GPS trackers.  I had an escort to and from my car at
7  graduation -- at graduate school.  My parents waited for me
8  every night in the garage to make sure I made it home safely,
9  and I lived like this every day.

10    Even miles away, this event has still taken an
11  emotional toll on my mental health that can never be erased.  I
12  am always taking note of who is around me, who may be following
13  too closely, and I have to censor my social media and not give
14  away too much information about where I am or who I am with
15  because of the constant fear the defendant has instilled in me.
16  I still wake up sweating from vivid nightmares.

17    The day the defendant was arrested was the day I was
18  able to find some sort of solace knowing that my family and I
19  were safe, at least for a little bit.  I lived for one year with
20  this relief, but I know that there will be one day where I will
21  not have this comfort, and that is the day that he is released
22  from prison.  My family lives within feet of his residence.  How
23  can we feel comfortable going to sleep every night?  How can
24  they go for a walk or unload their car?  They live in constant
25  fear like we all did before the defendant was arrested.

1              Your Honor, I urge you to think about the nature of

2    his crimes and what could happen when this individual is

3    released from prison.  He idolizes a man who murdered innocent

4    people solely because of their gender; someone who subscribes to

5    a violent and misogynistic ideology of male supremacy.

6              Please think about our community.  Think about

7    innocent women, moms, daughters, granddaughters, friends.  Think

8    about the two schools that are within walking distance from his

9    residence, and the children and the teachers.  Please think

10   about me and the other victims that are here today.  The

11   defendant poses a risk to all of those around him.  I am asking

12   for the maximum sentencing possible to ensure the protection of

13   innocent bystanders that might fall victim to the defendant's

14   actions.

15             Your Honor, thank you for listening to me today.

16             THE COURT:  All right.  Thank you.

17             MS. KIM:  Thank you, Your Honor.  Victim-2 now would

18   like to speak.

19             THE COURT:  All right.  Just give us a second.

20             VICTIM-2:  Good afternoon, Your Honor.  Judge, this

21   situation with David Kaufman has affected me in more ways than

22   one.  The situation severely impacted the normalcy of various

23   aspects of my life.  As a musician, it's very important to go

24   out of my way to put myself out there, whether it's trying to

25   post or promote myself online or physically performing in

1  public.  Because of this, I've become a lot more private and

2  refrain from posting online because I fear I will constantly be

3  harassed by David.  I also fear that he will show up to one of

4  my performances or harm me or people that I know.

5          The trust that I once had with people is diminished.

6  It has been a lot harder to build new relationships with people

7  that have a similar resemblance to David.  I feel that person

8  will have violent obsessive tendencies.  This isn't a way to

9  live, and I don't think it's fair that it is something I have to

10  go through.  I am also very sceptical about people now and very

11  cautious about letting new people into my life.  Ever since this

12  problem started, I have become more paranoid.  I've always had

13  David in the back of my mind, and that has led me to have

14  frequent nightmares, and these nightmares usually have David

15  showing up wherever I may be and trying to harm me.  The

16  paranoia always has me panicking whenever I hear a noise outside

17  or someone is knocking at the door of the house.  The first

18  thought that pops into my mind is that it has to be David, and

19  the horrible photo and threatening message David sent me of the

20  dead female resembling Chrissy will forever be ingrained into my

21  mind.

22          It's not fair for my family to feel like that, to

23  worry about someone like David harassing them.  They have been

24  worried about him stalking and appearing at night.  I cannot

25  believe that this situation has gotten to a point where it has

1 affected my family when they have nothing, absolutely nothing to

2 do with it.  Now, even my mom feels like she has to worry about

3 someone imitating me on the Internet.

4         Although I strongly believe that David deserves the

5 maximum sentence for what he has done, it has not only affected

6 me, but it's affected the people I care about around me.  I

7 don't feel that this will be the end after he gets out of jail,

8 and I don't think he has any remorse for the pain he has caused.

9         THE COURT:  All right.  Thank you.

10        VICTIM-2:  Thank you.

11        MS. KIM:  Your Honor, Victim-1 would now like to

12 speak.

13        THE COURT:  Okay.

14        VICTIM-1:  Your Honor, while writing this impact

15 statement and reflecting on the trauma I faced for nearly a

16 year, I almost felt as if I was looking back on a completely

17 different person.  Unfortunately, I have come to realize that

18 due to the actions of David Kaufman, I am not at all the same

19 person I once was nor will I ever be again.  There are so many

20 things about my old self that I miss dearly:  The trust I had in

21 people's intentions, the ability to take a walk without

22 obsessively checking behind my back, the ability to have a sound

23 sleep without nightmares, being able to wake up in the morning

24 without taking three different kinds of depression and anti-

25 anxiety medication; being able to hear the name "David" without

1    having severe anxiety due to PTSD.

2            When David's harassment started, I was still in the

3    process of grieving the death of my father.  During this time,

4    it had been a month shy of the one-year anniversary of his

5    sudden death.  Being re-traumatized again and again with the

6    comments disgracing my father's name, speaking of how happy he

7    was that the maggots were eating my father in the ground, and

8    making a Twitter account titled "John Melfi is Dead Ha Ha."

9    This harassment for nearly a year during this already horrific

10   time in my life took away the ability to properly grieve my

11   father's death, which still affects me to this day, and I will

12   never get that precious time back again.

13           With the 25th year of my life being stolen by David

14   Kaufman also came my diagnosis of depression, anxiety, and PTSD.

15   When I enter a building, I am constantly checking all exit

16   points in case David finds out where I am.  Being on stage as a

17   performer makes me feel I am at the most vulnerable being in a

18   wide open space and in part my passion, acting, which in the

19   past has made me feel most at ease, has given me a feeling of

20   terror and dread.  Loud noises send me into an intense panic

21   attack wondering if David has found me, and this will have been

22   my last day on Earth.  I am always triple-checking every door in

23   my home has been locked, trying to come up on an exit strategy

24   on how to hide my disabled mother in case he finds my home and

25   makes good on his threats to burn my house down with him and me

1   in it.

2          David did not need to ever physically see me, speak to

3   me, or be in my presence in order to ruin my life in more ways

4   than I think I even fully comprehend yet.  Although it seems

5   that justice will be served, David's constant public threats to

6   kill me came through.  I may still be physically alive, but my

7   innocent, trusting self was killed the day that David made the

8   decision to make me his victim.

9          I ask that David be punished to the full extent of the

10  law so that I can have some form of peace throughout this

11  horrible experience.  Although this will never truly be over, I

12  will spend the rest of my life trying to get back the little

13  pieces of me that David stole.  Thank you.

14          THE COURT:  All right.  Thank you.

15          All right.  Ms. Kim, does the government have any

16  comments or motions for the Court's consideration before I

17  impose a sentence upon the defendant?

18          MS. KIM:  Yes, Your Honor.  I would also like to

19  speak.

20          Your Honor, the defendant has robbed, very clearly

21  robbed, these victims of their safety, their security, and their

22  sense of trust, and the government requests the top of the

23  guidelines sentence here as necessary to reflect the seriousness

24  of the offense, to provide just punishment, to protect the

25  victims and the community from harm, and for purposes of

1 specific and general deterrence.

2         I wanted to start off by saying in preparing for this

3 sentencing I thought a lot about the defendant's conduct, his

4 background, and the victims in this case.  I thought a lot about

5 other threat cases that our office has prosecuted.  For example,

6 *United States versus Yilmaz*, where the defendant sent numerous

7 emails to his former girlfriend and was sentenced to 37 months,

8 the top of the guidelines, range by Judge Ramos.  And at the

9 heart of each of these cases was fear.  Fear that the defendant

10 wanted their victims to feel; fear of an attack, an assault, a

11 rape, a murder.  Fear that stopped the victims from living their

12 lives freely.  The defendant here has already admitted that he

13 terrorized women because he wanted him them to be afraid.  He

14 wanted to impact their lives, and the facts confirm his

15 admissions.

16         I would ask this Court here to imagine what the

17 victims have experienced.  Imagine receiving a handwritten note

18 at your childhood home that names you by first and last name

19 that was dropped off in person in your mailbox; that is clearly

20 from someone who knows you and knows where you and your family

21 live, a note that threatens to rape you until you cry, rip your

22 skin off, bomb you and murder you.

23         You report the note to police, and you eventually get

24 an order of protection, a piece of paper; and despite that court

25 order, the defendant continues to stalk you by Googling your

1  name and looking for your new address.  For someone who is not a

2  judge, a prosecutor or a federal agent, for an average member of

3  the public, the fear caused by the defendant and the fear that

4  he wanted to instill in the victims deeply impacts your life.

5         As Victim-3 just explained, her whole family lived in

6  fear.  They installed surveillance cameras in every corner of

7  their house.  Victim-3 needed to find someone to escort her to

8  and from her car every day.  They were in constant fear that

9  they were being watched and that they would be attacked.

10        Now for Victim-1 and Victim-2, the defendant's threats

11  and stalking extended for a much longer period, beyond one note

12  to dozens and dozens of messages across over 50 social media

13  accounts for nearly a year.  Threats to hang Victim-1, to slash,

14  to stab, to shoot, to rape, and to kill.  And there was no

15  stopping the defendant.  When the victims blocked his account

16  online, he simply created new ones over and over and over.  He

17  started posting threats publicly and sending messages to the

18  victims' friends.  He was asked to stop three times by law

19  enforcement.  He remained undeterred.  He was then arrested and

20  charged by the state.  He was ordered to stop harassing the

21  victims by a judge.  He still remained undeterred.  He felt he

22  was above the law.

23        Imagine knowing that a college classmate of yours, one

24  who knows you, where you live, what you do for a living, one who

25  is so laser focused on you that he spends each day harassing you

1   and sending death threats.  Imagine that fear.  That fear

2   impacted Victim-1 and Victim-2.  As they explained, as

3   performers, they were unable to post freely online to promote

4   their careers, their music and their art.  They were afraid of

5   stepping on a public stage.  They are constantly looking around

6   them, over their shoulders, afraid that they are not safe.

7               Victim-1 suffers from PTSD and depression.  Victim-2

8   suffers from paranoia, and he felt that the defendant was

9   planning something before his arrest in September of 2020, and

10  he was.  He was starting to plan an attack.  He was researching

11  how to make an assault rifle, how to illegally purchase guns,

12  where Victim-1 lived, what her house looked like.

13              For these victims, the defendant's conduct changed

14  their lives.  He took away their freedom and their ability to

15  live without fear.

16              There is another similarity across these threat cases,

17  and that is that the defendants in these cases often

18  dramatically minimize their conduct.  Here, the defendant

19  characterizes his crimes as using "provocative language."  But

20  his conduct was so much more than that.  His stalking spree was

21  extremely serious, calculated and profoundly harmful.  In

22  addition to the fear and the harm caused on the victims, there

23  are other aspects of the defendant's conduct that are extremely

24  serious and troubling.  The first is that the defendant is a

25  repeat offender.

 1              February 2019, he threatened and harassed Victim-3.

 2   Later in the month, February 2019, he harassed another woman and

 3   was approached by law enforcement and asked to stop.  In the

 4   fall of 2019, he began harassing and stalking Victim-1,

 5   Victim-2, and their mutual friends and acquaintances.  This was

 6   not a one-off event.  The defendant has harassed and threatened

 7   many, many victims over the course of many months.

 8              The second is that the defendant was driven by a deep-

 9   seated hatred of women.  None of the victims did anything in

10   this case to trigger the defendant.  Instead, he picked them

11   because they were women, and because, adhering to incel

12   ideology, they had wronged him by not giving him sex or

13   attention.  This is extremely concerning because there is no way

14   of knowing who the defendant's next victim may be.  Any woman

15   could be his next target.  This is also concerning because the

16   defendant still harbors the same hatred towards women, which I

17   will discuss in a minute.

18              The third troubling aspect of the defendant's conduct

19   is that he was receiving mental health treatment for nearly the

20   entire year he stalked Victim-1 and Victim-2.  He was on the

21   same medication he is on now, and he was meeting weekly with his

22   psychiatrist up until the time of his arrest in September 2020.

23   His psychiatrist and his family were aware of his conduct and

24   his July 2020 state arrest.  His psychiatrist and family decided

25   that around that time it was a "good idea" for him to move out

1  of the family home and live by himself, and during this time

2  period, he violated court orders and escalated his threats into

3  attack planning.

4            The record here shows that the defendant's mental

5  health treatment did not help.  It did not deter him from

6  committing crimes, and it actually coincides with when his

7  conduct was most severe, which leads me to my fourth point:

8  That nothing here deterred the defendant short of detention, not

9  his mental health treatment, not his parents, not his family,

10 not four warnings by law enforcement, not state charges or a

11 state arrest, not a court-ordered order of protection, not

12 pretrial supervision.  This is a defendant who clearly believed

13 he was above the law, and this is also a defendant who was given

14 opportunity after opportunity to abide by the law.  Law

15 enforcement reached out to him, talked to him, asked him to

16 stop, and he rejected all of these opportunities.

17            The fifth is that the defendant didn't just threaten,

18 stalk and harass.  He planned an attack.  He started researching

19 where Victim-1 lived.  He found her address.  He stored a

20 photograph of her home on his cellphone.  He started researching

21 how to make a semiautomatic rifle and how to buy a gun.  He

22 continued to watch incel propaganda.  The defendant's criminal

23 conduct only stopped when he was arrested and detained in this

24 case, which brings us to where we are today.

25            Your Honor, today the record establishes the defendant

1   continues to pose a danger to the victims and to the community.

2   All of the evidence shows that he will recidivate upon release.

3   The main point here, Your Honor, is this:  How many more

4   opportunities should this defendant be afforded to abide by the

5   law and at the expense of public safety?  There is no guarantee

6   that he won't resume his stalking of the victims or of other

7   women once released into the community.  The defendant continues

8   to harbor hostility against women, and he still appears to be an

9   incel.  He continues to be volatile, and according to his own

10  doctors, he is at risk for harming himself or others.

11          His doctors describe the defendant in the following

12  ways:  Dr. Brody, who treated the defendant when he stalked and

13  threatened the victims from 2019 to 2020, described the

14  defendant as a "very troubled man."  This is Exhibit C at 1.

15          Dr. Kessler, who treated the defendant from 2021 to

16  2022, draws similar conclusions and states that the defendant

17  "remains very much troubled."  This is Exhibit D at 2.

18          As an aside, Your Honor, the defense would like me to

19  clarify that on page 2 of the government's submission there

20  should be a citation to both Dr. Kessler and Dr. Brody's letters

21  with respect to the quote "very troubled" quotation.  Dr.

22  Kessler, the full quotation is that the defendant's "medications

23  have not dissipated nor offset the active aggressive fantasy

24  that he, the defendant, experiences in his thinking."  He goes

25  on to say, "David Kaufman remains very troubled by his inability

1  to establish meaningful heterosexual relationships."  In this

2  regard he noted, quoting the defendant, "Women never give me the

3  time of day."

4        Kate Termini, the defendant's psychologist, describes

5  the defendant as "quick to harbor strong feelings of resentment

6  as a result of perceived slights and insults."  This is Defense

7  Exhibit D at 2.  After conducting testing on the defendant,

8  Termini concluded that the defendant is "likely to be extremely

9  sensitive in social interactions and very quick to perceive

10  rejection, real or imagined, by others."

11        She goes on to say that the defendant's "combination

12  of impulsivity and anger and dysphoria could place him at an

13  increased risk for self harm or acting out behaviors," and this,

14  of course, includes harming others.

15        These are all red flags.  They are markers of a

16  recidivist.

17        Third, the defendant paints himself as a victim.  He

18  deflects blame and, quite frankly, that's exactly what incels

19  do.  Incels blame women for their inability to cultivate

20  romantic relationships.  What the defendant asked for here,

21  outpatient treatment and to live with his parents, these are the

22  same exact circumstances under which he committed the offenses.

23        I want to now just touch briefly on the defendant's

24  sentencing submission, which, to the government, is extremely

25  troubling on many levels.

 1          First, the defendant's submission only focuses on what

 2  he wants.  It in no way addresses the other 3553(a) factors.  He

 3  doesn't engage with his own criminal conduct apart from

 4  minimizing his threats as "provocative language."

 5          Second, the defendant dramatically overstates his

 6  cognitive deficits.  He tries to paint himself as a child, as

 7  boyish and immature, and this immaturity is why he does not to

 8  this day recognize the harm he caused.  In other words, the

 9  defendant believes that his conduct was not a big deal.  Your

10  Honor, this is an age-old excuse that has been used by young men

11  across the country.  Boys will be boys.  They will grow out of

12  it.  Give him a chance.  It is why grown men are constantly

13  getting breaks for acts of violence against women:  Sexual

14  assault, rape, domestic violence and stalking.  A time-served

15  sentence here is simply not appropriate.

16          The defendant, moreover, is not a child.  He is a man.

17  He is nearly 30 years old.  He is educated.  He has a college

18  degree.  He has been supported by his upper middle class family

19  for all of his life.  He is extremely privileged.  He is not

20  entitled here to yet another opportunity at the expense of the

21  victims' safety.

22          Finally, the defendant tries to hide behind his mental

23  health issues, similar to the defendant in *Yilmaz*.  Your Honor,

24  I think everyone in this room has sympathy for mental health

25  issues, which are extremely prevalent in the world today.

1  According to the National Institute for Mental Health, nearly

2  one in five people in the U.S. have mental health issues.  Many

3  of those issues are far more severe than the defendant's, but

4  not everyone who suffers from a mental health issue or

5  depression then stalks and terrorizes multiple women and tries

6  to plan a violent attack.

7          The defendant, moreover, and his family, and his

8  therapists have known about his mental health issues for at

9  least a decade beginning in high school, and he's been

10 privileged enough to receive significant counseling and

11 treatment for years.  The defendant was getting treatment, and

12 he was on medication when he committed these crimes, and

13 moreover, he has a history of not committing to his mental

14 health treatment, including noncompliance with his medication.

15         I submit to the Court that in this case the

16 defendant's mental health is simply not an excuse for his year-

17 long, calculated, unrelenting spree of violent threats.  Threats

18 of rape, sexual assault, hanging, shooting, stabbing, stalking

19 and murder.  Threats that terrorized his victims and his

20 community that came from a place of deep-seated hatred and

21 hostility towards women, threats that he acted upon in beginning

22 to plan an attack.

23         Finally, the defendant's submission is troubling

24 because it states the defendant does not understand the

25 seriousness of his offense.  That is clearly a problem, and it

1  begs the questions:  Will the defendant abide by the orders of

2  protection, by the terms of his supervised release?  Who would

3  guarantee that the victims in this case will be safe?  Who can

4  guarantee that the defendant won't stop and threaten other

5  victims?  The answer, Your Honor, is no one.  Not his parents,

6  not his psychiatrist.  But the Court can ensure that the

7  defendant does not harm others for at least 16 more months, 16

8  more months during which the victims can breathe freely and try

9  to heal from the defendant's horrific conduct.  Sixteen more

10  months during which the victims do not need to worry about the

11  defendant attacking them.

12          In closing, Your Honor, sentences, as the Court knows,

13  impact the way the public views certain crimes.  They can affect

14  whether victims come forward to report future crimes or

15  cooperate with law enforcement.  Lenient sentences for stalking

16  send a message to the public that these crimes are not serious,

17  not important enough; that the victims' trauma does not matter.

18  We ask the Court to show the victims in this case, the

19  defendant, and the public that this case matters; that what the

20  defendant did was wrong and serious, and that he will be held

21  accountable.  Such a sentence would ensure the safety and

22  security of the victims.

23          And for all of these reasons, and those in our

24  submission, the government respectfully submits that a sentence

25  at the top of the guidelines range of 30 to 37 months is

```
 1  necessary and warranted in this case.  Thank you, Your Honor.
 2              THE COURT:  All right.  Thank you, counselor.
 3              Mr. Burke, is there anything you would like to say on
 4  behalf of your client before I impose a sentence upon him?
 5              MR. BURKE:  Yes, Your Honor.  And my client would like
 6  to speak as well.
 7              THE COURT:  Yes.
 8              MR. BURKE:  Your Honor, first, I provided to the
 9  government a copy of a certificate that I received this morning
10  from my client where he completed the eight-week Resolve to Stop
11  Violence Program at the Westchester County Jail, and I would
12  like to provide a copy of that to the Court.
13              THE COURT:  Sure.
14              MR. BURKE:  I have already provided a copy to the
15  government.
16              THE COURT:  Okay.
17              MR. BURKE:  Your Honor, David Kaufman is a 28-year-old
18  man who has severe mental illness that we have outlined, and
19  that is outlined in the presentence report.  He has fully
20  accepted his responsibility by pleading guilty to the offense of
21  Internet stalking, and he will speak as to an apology and
22  remorse that he feels for the conduct and his threats and the
23  harm that that has caused.
24              He has no criminal history.  There is no history
25  whatsoever in his school records of any kind of assaultive
```

1  behavior.  In this case he had made threats over the Internet,

2  horrific, awful statements to the victims who he knew from

3  school and from his neighborhood.  His sentence -- he has

4  already been incarcerated, as the Court knows, for 20 months,

5  nearly two times the mandatory minimum of one year for this

6  offense.  There are certain measures that can be put in place

7  here, Your Honor, to provide the victims some degree of closure

8  and moving on.  The first is his father is present in the court,

9  and has been present throughout this proceeding.  I've spoken

10 with him, and he has taken steps and signed a contract.  They

11 are selling their home.  They are moving from the neighborhood

12 where Victim-3 lives so that they can begin to move on in their

13 lives, and they can move to a different location so that they

14 don't have to have that constant fear of a neighbor up the

15 street.

16         There also is monitoring software on his computer and

17 phone that will be part of his probationary supervision to make

18 sure he is not conducting any searches or making any further

19 threats.  GPS monitoring on him is a condition of probation.  If

20 the probation officer sees fit, they can also address where he

21 is located, where he is not allowed to go, and if there is any

22 violation whatsoever, through a GPS monitoring system, as well

23 as the continued mental health treatment that he began with Dr.

24 Kessler, who is the Probation's mental health treatment

25 provider.  He began that, Your Honor, as I stated in my

1 sentencing submission, remotely because the jail does not

2 provide the cognitive behavioral therapy that he's needed.  They

3 do provide the medication, and he is receiving that medication.

4 He is actually on a different medication now.  He is on Luvox

5 and Seroquel.  He previously was on Prozac and Seroquel.  The

6 levels that he's on now are higher and have stabilized his

7 anger, his thoughts, his improper conduct.

8           For 20 months he hasn't had any issues while at jail.

9 Yes, his communications have been limited, but there were no

10 letters sent or further threatening conduct.  There was no phone

11 calls made of further threatening conduct.  Again, I know that

12 that's monitored, but nonetheless, there also wasn't any issues

13 where he got into assaults with female staff, female mental

14 health professionals, nothing along those lines.

15          He completed the anger management program that I have

16 stated while in jail.  The sessions that he's had with Dr.

17 Kessler since October has provided a base and has built a

18 rapport with Dr. Kessler.  I spoke to him again this morning,

19 and we want to be able to continue that.  Unfortunately, because

20 of the structure, he was doing it remotely through Securus,

21 through an app, and now the jail has no longer allowed that to

22 be done.  The jail has, through their outside provider, Wellpath

23 is the name of the provider, has reached out to Mental Health

24 Associates of Westchester County, had Mr. Kaufman screened, and

25 he has been accepted.  The letter was in September of 2021.  I

1  have been in contact with them again to update that, and they

2  have -- they have arranged for a further screening so he could

3  be accepted into that intensive outpatient program, one which he

4  has never engaged in before.

5         He is committed to addressing his mental health

6  issues.  He is remorseful.  I have spoken to him at length about

7  that, and he is prepared to read his own statement because I

8  think his words, not mine, are more important for the victims to

9  hear.

10         As I have stated, Your Honor, in my sentencing

11  submission, his mental health conditions involved depression,

12  body dysmorphia disorder, obsessive-compulsive disorder, mixed

13  personality disorder, as well as a strong likelihood that he had

14  antecedent stemming from autism spectrum disorder.

15         A 20-month sentence incarcerated during the pandemic

16  there was times -- the Court is well aware of this from the

17  number of motions you get as far as compassionate release --

18  when you are in lockdown 24 hours a day because of quarantines,

19  because of the coronavirus that spread throughout the

20  Westchester County Jail.  He has been there that whole time,

21  going through the quarantines, having additional confinement

22  where he is not allowed to leave his cell.  Those are all

23  because of his actions and the threats in this case.  He is

24  aware that he has caused great harm to the victims, and as I

25  said, he will speak to that.

1          Your Honor, when you factor in the 3553(a) factors, as

2   Probation recognizes in paragraph 117 that the Court can

3   consider Mr. Kaufman's purported mental health conditions and

4   lack of criminal history for a sentence below the guidelines.  A

5   20-month sentence is not nothing.  He has been incarcerated for

6   that period of time for his conduct.  This isn't a free pass as

7   the government would suggest.  Sixteen more months won't address

8   the core issues of the cognitive behavioral therapy that he

9   didn't have before that he will have now and he began with Dr.

10  Kessler.

11          THE COURT:  I am going to interrupt you, and I am

12  going to apologize, but this is the concern that I have.  The

13  government makes a compelling case, and that is:  Not only was

14  your client receiving medication and therapy, all right, during

15  the course of these acts, all right, but despite that, it

16  appears to me that there was a relentless assault on these

17  victims, all right, and that even after law enforcement agencies

18  were notified, that persistent attack never lessened.  And

19  that's a major concern to me because, look, I can impose a

20  sentence on him, right, and I can give him the max under the

21  sentencing guidelines, but my concern goes beyond that.  All

22  right.  How do I assure that there is the -- that this is a

23  deterrence?  That I impose a sentence that's a deterrence when

24  there is someone who is under therapy, is on medication, and

25  then gets informed by law enforcement that they are on notice of

1  his criminal behavior, and is given an order of protection and

2  flaunts the order of protection?  That's the concern that I

3  have.

4           MR. BURKE:  And I appreciate the Court's concern, and

5  the difference here is that he has now been incarcerated for

6  20 months, and the fear of going back to prison and being re-

7  incarcerated if he runs afoul of violating any of the conditions

8  of supervised release.

9           As to the mental health treatment, he wasn't fully

10 medication compliant, but the difference between then and now

11 are the 20 months that he's spent in jail.

12          THE COURT:  Yes, but this is the issue that I have

13 with that, and it's an argument that's made routinely by defense

14 attorneys.  Part of the reason why he is compliant is because

15 now he is on supervision.  He is being watched.  Right?  And he

16 also knows, all right, typically these defendants know that they

17 are going to come before a judge, and that the judge is going to

18 make the inquiry, all right?  And so they attempt to be on their

19 best behavior while they are being detained pending sentencing.

20 All right.  I have plenty of cases where these individuals

21 unfortunately go back to their old ways of noncompliance with

22 medication, all right, and wind up appearing before me again and

23 again and again.

24          These are serious acts, very serious acts.  To think

25 that someone can't leave their home for fear of being attacked

1   because someone is sending them repeat messages of, you know,

2   threats, you know, they make a pretty compelling case, the

3   victims and the government.

4          MR. BURKE:  Your Honor, I am in no way minimizing the

5   impact that his conduct has caused through these threats.  What

6   I am addressing here is that we all agree that a time will come

7   where he will be released.  I have set up, hopefully, the

8   pathway by having him with Dr. Kessler so that when he does get

9   out, he has that rapport, and there is the continuum of care.

10          I know from experience with the BOP that when he

11  leaves Valhalla, he is not going to get any mental health

12  treatment, and likely that the medication regime will change

13  when he -- wherever he goes through the BOP.  Here, he has been

14  medication compliant.  Yes, in part because he is being

15  monitored, which he will be monitored when he gets out through

16  Probation.  He has -- and the family has taken steps to try to

17  alleviate pain for Victim-3 by moving away so that they can just

18  hopefully allow them some healing and to move on.

19          So, Your Honor, you are right, his conduct was

20  egregious.  His conduct was threatening, and it caused fear to

21  these victims.  I recognize that.  He recognizes that.  His

22  father recognizes that.  Yes, he continued to make those threats

23  while he was out.  Twenty months later, he is a different person

24  having spent 20 months in prison after spending no time in

25  prison.  The fear of going back has a sufficient fear here, Your

1  Honor.  He is going to be on the maximum supervised release for

2  three years.  Probation can extend that if he violates, if he is

3  not medication compliant, if he is not doing what he needs to

4  do.  He is moving back in with his parents.

5          THE COURT:  Well, Probation can't extend that.  They

6  would have to bring a violation --

7          MR. BURKE:  Yes.  I am sorry.

8          THE COURT:  -- for supervised release, and then I

9  would have to have a hearing and determine whether or not it's

10 appropriate.

11         MR. BURKE:  Correct.

12         THE COURT:  So there is a whole procedure --

13         MR. BURKE:  Right.

14         THE COURT:  -- that has to take place.

15         MR. BURKE:  I meant that, Your Honor.

16         THE COURT:  I understand.  I understand.  But I want

17 that to be clear that the Probation doesn't necessarily have the

18 right.  What they have the right to do is to come before the

19 Court and seek an extension of supervision based on his failure

20 to comply, and this is something that I typically tell the

21 defendants; that when I sentence them, if they come before me,

22 and it's proven that they violate the terms of their supervised

23 release, I am not hesitant to impose the maximum sentence, which

24 involves a time of detention.  No qualms at all.  I typically do

25 that.

1              MR. BURKE:  And with that understanding, he has that

2    hanging over his head, a potential three-year sentence with

3    supervised release again extended beyond that.  So he has the

4    appropriate motivations to remain medication compliant, not to

5    go on the Internet again and threaten anyone, not to research

6    anything on the Internet through the monitoring software, as we

7    talked about, and the Court is well aware will be placed on his

8    computer, including the GPS tracking device to make sure that he

9    isn't going where he is not supposed to be consistent with the

10   Order of Protection.  Those are the conditions, Your Honor, that

11   were not in place before, but will be in place now to some

12   degree to assure the victims that this will not happen again.

13             THE COURT:  This is the troubling part that I have

14   with this, Mr. Burke.

15             MR. BURKE:  I am sorry?

16             THE COURT:  This is the troubling part that I have

17   with this, and that is, you commit these acts, these threats;

18   law enforcement coming to your home or wherever you are located.

19   They tell you that we are aware of these threats.  He gets

20   served with papers, an Order of Protection, and despite that,

21   the threats continue.  That's the trouble that I am having with

22   this.

23             MR. BURKE:  And --

24             THE COURT:  And what you are asking me to do is to

25   basically give him time served, and basically put him back out

1    there; give him a piece of paper that says that he can't come

2    within close proximity of certain individuals, victims, and the

3    question that I have:  Am my setting up a scenario where he is

4    basically being put in the same scenario that he was when law

5    enforcement officers come to his home and told him of his bad

6    conduct and served him with a notice of protection?  Am I doing

7    that?  Or do I need to send a stronger message?  That's the

8    analysis that I am undertaking right now because it's apparent

9    to me that he is in therapy.  He is on medication.  It doesn't

10   take a brain surgeon to know that when the police come to your

11   home, and you are informed that your acts are criminal, that

12   these threats are criminal, that an Order of Protection has been

13   issued advising you to stay away, and despite that, it doesn't

14   seem to work.  It doesn't seem to deter.

15          So that's the -- that's the bottom line that I am

16   struggling with right now.  You are asking for a time-served

17   sentence, and the government is saying this guy's a threat, he's

18   not going to be deterred.  All right?  And look how he's behaved

19   in the past when he was notified by law enforcement officers

20   that they are aware of his threats; that he has been handed an

21   Order of Protection, and he still felt compelled, in the face of

22   all that, to continue threats.

23          So that's what I am processing in my mind in trying to

24   serve justice in this case at issue when I make a determination

25   as to what's an appropriate sentence.

1          MR. BURKE:  Your Honor, I handle threat cases as well,

2   and one before Judge Karas --

3          THE COURT:  I understand that, but with all due

4   respect, you are not the one that sentences someone, right?

5          MR. BURKE:  No, I am not.  And I know it's not an easy

6   task, Your Honor.  All I am saying is there, that individual who

7   had mental illness, who was a young man, he continued his

8   conduct, even while incarcerated, of making threats, which

9   didn't occur here, and that's the only reason why I draw the

10  parallel in saying, he's been incarcerated for 20 months, and

11  that is a sufficient deterrent for anyone who's never been

12  incarcerated before, as far as what the conditions of

13  confinement are like, what he went through as far as being in

14  lockdown.

15         So to say that an additional amount of time would

16  somehow further deter him, he has already been deterred.

17  Twenty months has sent that message.  An additional number of

18  months isn't going to send the message any more.

19         THE COURT:  All right.  Anything else, Mr. Burke?

20         MR. BURKE:  No, Your Honor.

21         THE COURT:  All right.  Thank you, Mr. Burke.

22         Mr. Kaufman, is there anything you would like to say

23  on your own behalf before I impose a sentence upon you?

24         THE DEFENDANT:  Yes, I would, sir.  Thank you.

25         It is with profound remorse that I --

1            THE COURT:  Mr. Kaufman, you have to slow down, and I
2   understand -- I understand that you are nervous, but you have to
3   slow down so that everything that you say can be memorialized.
4            THE DEFENDANT:  Okay.  It is with profound remorse
5   that I give my most humble apologies to the victims, their
6   families, and the community.  I used the rage and selfish
7   feelings inside of me as an excuse to hurt others, and I made
8   them fear for their lives and the lives of their loved ones.
9   Many of the victims had extended an olive branch to help me cope
10  with my pain.  I am grateful and honored by their generosity,
11  and I know they had good intentions.
12            There is not a soul on this earth that deserves to be
13  harassed, stalked and threatened the way my victims were
14  subjected to.  I cannot take away the harm I brought upon
15  others.  I understand the implications of my actions and the
16  consequences they bring.  This is why I humbly accept the time I
17  served and hope the victims will quickly move on from the trauma
18  I brought upon them.
19            I also hurt my family through my reckless behavior.
20  They told me to stop what I was doing more times than I can
21  count, but every step of the way I pushed their concern aside
22  for my own personal vendetta, and to them I apologize for what I
23  put them through.  I have learned from this experience, and I
24  have learned to grow as a person.  During my time in jail, I
25  have been finding the correct path for myself and will continue

1   to do so for the sake of my mental health, my community, and my

2   family.

3               And I have one more letter I would like to read, Your

4   Honor.

5               THE COURT:  Sure.

6               THE DEFENDANT:  Just yesterday I read the victim

7   impact statements, and they are all -- the person that I was --

8   I am not the person that I was.  Looking back, it is hard to

9   believe that I let myself get to a point where I terrorized,

10  stalked, threatened, and harassed the victims, giving them and

11  their family psychological scars.  I take full responsibility,

12  and I am finally sorry for what I did to these people.  It

13  wasn't just making a mistake or a few mistakes.  I went through

14  a series of horrible choices over and over because of my selfish

15  idolizations and desires.

16              Obviously, I can't take away the pain and trauma these

17  people endured because of me.  The best that I can do is to be

18  honest about the kind of person that I was and talk about how I

19  have changed to become the person that I am today.

20              One thing for certain is that I don't want to live the

21  rest of my life as a monster whose sole purpose is to terrorize

22  and ruin peoples' lives, the damage that's been done, none of

23  which I can fix in any way possible.

24              Although some day I will have to move back in with my

25  parents when I come home from prison.  They are currently in the

1  process of buying a new house away from Victim-3, and her family

2  can at least know that I have moved much farther away from them.

3          My family is devastated by what I have done, but they

4  have continually given me support that I need -- sorry -- the

5  support I need to become a mentally healthy person again.  The

6  things I said were vulgar, disgusting, evil, and gut-wrenching.

7  Although a few words can seem like very many, I will commit

8  myself to getting the therapy and mental health treatment I

9  need, more specifically by going to an outpatient mental health

10  program, which will be a new experience for me.

11          I am so sorry for being a callous, insidious, horrific

12  human being, and I do not want to or plan to harass, stalk or

13  threaten another person again.  Thank you.

14          THE COURT:  All right.  Thank you, Mr. Kaufman.

15          MS. KIM:  Your Honor, could I just say a few

16  additional words if possible?

17          THE COURT:  Sure.

18          MS. KIM:  Thank you, Your Honor.  I just wanted to

19  clarify a few points for the record.  The first is that the

20  defendant, it appears, when he was treated by Dr. Brody, that he

21  was treated with the same medication, Luvox and Seroquel.  I

22  don't know, there is no indication from these records whether or

23  not those prescriptions changed.

24          Second, the defense describes the defendant as now

25  being stabilized, but that's clearly not the description given

1  by Dr. Kessler, who says that the medications have not

2  dissipated, nor has the active aggressive fantasy life that the

3  defendant experiences, and he remains very much troubled by his

4  inability to establish meaningful heterosexual relationships.

5          The third is with respect to the autism diagnosis.

6  The government just wants to state on the record, as we have

7  explained in our submission, that there has been no diagnosis,

8  at least that the government has been able to find, apart from

9  when the defendant was two or three years old.  By all accounts,

10 the defendant graduated from high school.  He was monitored when

11 he was in middle school and high school.  He was taken off of

12 specialized education; I think it was called "declassified" in

13 or about sixth grade, and then he went on to college where he

14 graduated with a music education degree.

15         With respect to the house, that is, the defendant's

16 parents' house, we learned today from defense counsel that the

17 defendant's parents plan to sell their house and move; but given

18 how long it usually takes for that process to work, we have no

19 confidence that once the defendant is released, he won't be

20 living down the street from Victim-1 -- Victim-3 for at least a

21 period of time.

22         I will make my sort of last set of comments brief.  I

23 think the Court has completely hit the nail on the head with

24 respect to the danger that the defendant poses to the victims

25 and to the community, and I would like to just sort of walk the

1  Court through very briefly some of the searches that the
2  defendant conducted after he was arrested and charged with state
3  criminal charges, and the state court judge ordered the orders
4  of protection.  So that occurred on July 14th.  He was
5  interviewed by law enforcement on July 13th.  On July 13th, he
6  searches online for Victim-1, for "incel with gun" again for
7  Victim-1.  Victim-2, the next day, the 14th, he searches for
8  Victims-1 and 2.  The 15th he searches for Victim-1, Victim-3,
9  for "incel threat."  He continues on day after day searching for
10 the victims, and as I discussed earlier, he starts searching for
11 the locations and the residences of the victims, as well as how
12 to obtain firearms unlawfully and how to assemble a rifle.
13         And so for all of these reasons, Your Honor, the
14 government is extremely concerned about the danger that the
15 defendant poses, and we ask the Court to protect the victims and
16 the community in this case, to let the victims live freely
17 without fear, without constantly looking over their shoulders,
18 and without the real risk of being attacked by the defendant.
19         Thank you, Your Honor.
20         MR. BURKE:  Your Honor --
21         THE COURT:  Mr. Burke, anything you want to say in
22 response?
23         MR. BURKE:  Yes.  Just that the sentence that precedes
24 from Dr. Kessler's report regarding the stability from the
25 medications, he states -- and this is the sentence before the

1    portion that AUSA Kim just read -- it says, "The Prozac and
2    Seroquel medications that he has been taking during the
3    incarceration have provided a sense of stability for him."  So
4    that's where I drew Dr. Kessler's view as far as the stabilizing
5    effect of the medication that he has been on for a longer period
6    of time, and from what I understand, a higher dosage of what he
7    was previously receiving, and even Dr. Brody says that he wasn't
8    fully medication compliant.  He is now.  Yes, there is that
9    oversight, but there will be that oversight as well as part of
10   probation, as part of the required conditions that he continue
11   treatment with Dr. Kessler who will -- and other
12   psychiatrists -- who would be able to test to see if the levels
13   are where they should be to make sure that he is medication
14   compliant.
15          So, Your Honor, I have said all that I need to say
16   here.  My client has said what he has said.  He is remorseful
17   and wishes that hopefully that the victims can heal somewhat and
18   begin to move on, and that his statement of being in 20 months
19   he has learned that he doesn't want to return back to prison.
20   He doesn't want to return back, and the way that he would return
21   back to prison is if he goes online and does anything he is not
22   supposed to be doing, if he attempts to reach out to any of
23   these victims.
24          The house, and under the current market, they did sign
25   a contract.  It will be -- there is fewer houses for sale, and

1  from what the brokers told my client's father, the house will

2  sell quickly once it is listed.  They signed the contract within

3  the last few weeks, and it will be listed within a few weeks.

4  So that is something that will be in place so that, again,

5  they -- he could have moved back to his parents there, but they

6  wanted to make sure that they could try to provide some degree

7  of closure for the family down the street, and they have done

8  that.  So that as a sign of, hopefully, and understanding that

9  they want them to be able to live their lives without the fear

10 that David instilled in them.

11          THE COURT:  All right.  Thank you, Mr. Burke.

12          In accordance with the decision by the Supreme Court

13 in *United States versus Booker*, while the United States

14 sentencing guidelines are not mandatory, this Court nonetheless

15 must consult those guidelines and take them into account when

16 sentencing.  Therefore, this Court has considered the findings

17 of fact stated in the presentence report, as well as the

18 guidelines analysis and recommendations contained therein.  The

19 Court has weighed this information, along with the factors

20 listed in 18 U.S.C. Section 3553(a), in coming to its final

21 sentencing decision.

22          The Court adopts the factual recitation in the

23 presentence investigation report.  The presentence investigation

24 report includes the computation of Mr. Kaufman's offense level

25 amounts to 19.  His criminal history falls into Category I.  The

1  guidelines sentence for that offense level and criminal history

2  category listed in the presentence report is 30 to 37 months'

3  imprisonment.

4          Count Two has a guidelines range of one to three years

5  of supervised release.  In addition, the applicable fine range

6  is $10,000 to $100,000.

7          Mr. Kaufman, you have been found guilty of Count Two:

8  Using the mail, any interactive computer service or electronic

9  communication service or electronic communication system of

10 interstate commerce, or any other facility of interstate or

11 foreign commerce, with the intent to kill, injure, harass and

12 intimidate another person, to engage in a course of conduct

13 that, A, placed the person in reasonable fear of the death of

14 and serious bodily injury to that person and to that person's

15 family member or intimate partner, and B, caused, attempted to

16 cause, and would be reasonably expected to cause substantial

17 emotional distress to that person, in violation of a temporary

18 or permanent civil or criminal injunction, restraining order,

19 no-contact order, or other order described in Title 18 United

20 States Code Section 2226 in violation of 18 United States Code

21 Sections 2264(a)(2)(A), 2261(a)(2)(B), 2261(b)(6), 2266, and 2.

22         The Probation Office has recommended that the Court

23 impose a sentence of 30 months' incarceration followed by three

24 years of supervised release.  The Probation Office noted that

25 for this offense to which you have pled guilty you must pay a

1  special assessment of $100 in accordance with 18 U.S.C. Section

2  3013.  The Probation Office has recommended that no fine be

3  imposed, and that restitution shall be provided in the amount of

4  $1,404.40.  As to restitution, the parties have stipulated to

5  the amount, and as so indicated by the Court, $1,404.40.

6          Subsection (a)(1) of 18 U.S.C. Section 3553 requires

7  that courts take into consideration the nature and circumstances

8  of the offense, and the history and characteristics of the

9  defendant.  Subsection (a)(2) of 18 U.S.C. Section 3553 requires

10 that the Court consider the need for the sentence to promote

11 certain objectives of the criminal justice, namely:  Punishment,

12 specific and general deterrence, and rehabilitation.  The Court

13 must also consider the kinds of sentences available, the

14 sentencing guidelines, pertinent policy statements, the need to

15 avoid unwarranted sentencing disparities and the need to provide

16 restitution to victims.

17         I have considered the arguments made by both sides and

18 the information provided by the parties, including Mr. Kaufman's

19 acceptance of responsibility for his actions, the nature and

20 circumstances of the crime, his prior criminal history, his

21 history and characteristics, and the seriousness of his crimes.

22         Taking into account the nature and circumstances of

23 the offense and the history and characteristics of the

24 defendant, and considering all of the factors listed in 18

25 U.S.C. Section 3553(a), this Court finds that a sentence of

1  30 months' imprisonment to be followed by a term of three years'

2  supervised release, with the first six months of supervised

3  release in home confinement, is reasonable and appropriate in

4  that such terms are sufficient, but not greater than necessary,

5  to promote the proper objectives of sentencing.

6           With respect to the home confinement, that will be

7  with Radio Frequency Monitoring, and the only time that

8  Mr. Kaufman can leave the home during the six months of home

9  confinement is for medical appointments.

10          In addition, the defendant is ordered to pay to the

11  United States a mandatory special assessment of a $100, which

12  shall be due immediately.

13          Based on the presentence report's recommendation, I

14  will not impose a fine.

15          As to restitution, the parties have stipulated to an

16  amount of $1,404.40.

17          All right.  The Court has also issued an Order of

18  Protection -- or rather a Consent Order of Protection.

19          Mr. Kaufman, upon your release from custody, you shall

20  be placed on supervised release for a period of three years, the

21  first six months to be served under home confinement.  During

22  your term of supervised release, you must comply with the

23  mandatory conditions of supervision as detailed on pages 23 of

24  the presentence report, and the standard conditions of

25  supervision as detailed on pages 24 and 25 of the presentence

1    report.

2            In addition, Mr. Kaufman, you must obey the following

3    special conditions while on supervised release:  One, you shall

4    submit your person, and any property, residence, vehicle,

5    computer or other electronic communications, data storage

6    devices, cloud storage and media and effects to search by any

7    United States probation officer, and if needed, with the

8    assistance of any law enforcement.  The search is to be

9    conducted when there is reasonable suspicion concerning

10   violation of a condition of supervision or unlawful conduct by

11   the person being supervised, meaning you, Mr. Kaufman.  Failure

12   to submit to a search may be grounds for revocation of

13   supervised release.  You shall warn any other occupants that the

14   premises may be subject to searches pursuant to this condition.

15   Any search shall be conducted at a reason time and in a

16   reasonable manner.

17           Two, you shall submit -- permit, rather, the U.S.

18   Probation Office to install any application or software that

19   allows it to survey and/or monitor all activity on any computer,

20   automated services, or connected devices that you will use

21   during the term of supervision and that can access the Internet,

22   and the United States Probation Office is authorized to install

23   such applications or software.  Tampering with or circumventing

24   the United States Probation Office's monitoring capability is

25   prohibited.  To ensure compliance with the computer monitoring

1  condition, you must allow the probation officer to conduct

2  initial and periodic unannounced examinations of any devices

3  that are subject to monitoring.

4          You must notify any other persons who use the devices

5  that it is subject to examination pursuant to this condition.

6  You must provide the U.S. Probation Office advance notification

7  of planned use of any devices, and you will not use any devices

8  without approval until compatibility is determined and

9  installation is completed.

10         Applications for your devices shall be approved by the

11  United States Probation Office once the Probation Office ensures

12  compatibility with the surveillance/monitoring application or

13  software.  Websites, chat rooms, messaging, and social

14  networking sites shall be accessed via the devices' web browser

15  unless otherwise authorized.  You will not create or access any

16  Internet service provider account or other online service using

17  someone else's account, name, designation or aliases.  You will

18  not utilize any peer-to-peer and/or file-sharing applications

19  without the approval of your probation officer.  The use of any

20  device in the course of employment will be subject to monitoring

21  or restriction as permitted by your employer.

22         Three, you must participate in an outpatient mental

23  health treatment program approved by the United States Probation

24  Office.  You must continue to take any prescribed medications

25  unless otherwise instructed by the health care provider.  You

1    must contribute to the cost of services rendered based on your

2    ability to pay and availability of third-party payments.  The

3    Court authorizes the release of available psychological and

4    psychiatric evaluations and reports, including the presentence

5    investigation report, to health care providers.

6              Four, you shall stay at least 100 yards away from the

7    victims listed in Attachment A of the Consent Order of

8    Protection to which you and the government stipulated.  That

9    includes their family members as listed in the United States

10   Schedule A.  You shall also stay at least a hundred yards away

11   from the home, school, business and place of employment of the

12   victims.  You shall refrain from having any communication or any

13   other contact, directly or indirectly, to any other person by

14   mail, telephone, email, voicemail, social media, or any other

15   means with the victims.  You shall also refrain from harassing,

16   intimidating, threatening or otherwise interfering with the

17   victims and with members of their households.

18             As the parties have stipulated that the protective

19   order in this case applies to three victims listed in the

20   Attachment A of the Consent Protective Order, along with several

21   family members of the victims listed, the Court hereby amends

22   the presentence report to reflect the special conditions of

23   supervised release applies to Victims 1 through 3, and not just

24   to Victims 1 and 2.  All right.  And it also applies to members

25   of -- the family members of the Victims 1 through 3.

1              It's my understanding the government will be seeking

2    to amend the protective order to include additional victims; is

3    that correct?

4              MS. KIM:  Yes, Your Honor.

5              THE COURT:  All right.  Mr. Kaufman, do you understand

6    each and every one of these conditions?

7              THE DEFENDANT:  Yes, I do.

8              THE COURT:  Upon your release from custody, you must

9    report to the nearest probation office within 72 hours.  The

10   Court recommends that you be supervised by the district of

11   residence.

12             The sentence as stated is imposed.

13             Mr. Kaufman, you have the right to appeal your

14   sentence.  Any notice of appeal must be filed within 14 days

15   after the entry of judgment, so if you wish to appeal, you must

16   advise your attorney to prepare and file a notice of appeal

17   immediately.  If you are enable to pay the costs of an appeal,

18   you have the right to apply for leave to appeal *in forma*

19   *pauperis*, meaning as a poor person.  If you make such a request,

20   the Clerk of the Court must immediately prepare and file a

21   notice of appeal on your behalf.

22             Do you understand your right to appeal to the extent

23   it may exist?

24             THE DEFENDANT:  Yes, I do.

25             THE COURT:  All right.  Counselors, are there any

```
1   remaining counts, underlying information or accusatory
2   instruments that need to be addressed or dismissed at this time?
3            MS. KIM:  Your Honor, there is one count, Count One of
4   the Indictment, and the government moves to dismiss that count.
5            THE COURT:  All right.  I take it there is no
6   opposition.  The Court grants the application to dismiss Count
7   One.
8            Any other applications, any recommendations that
9   defense counsel would like me to make to the BOP?
10           MR. BURKE:  Yes, Your Honor.  We are requesting FMC
11  Devens.  That may have the hospital that he would be able to --
12           THE COURT:  I am sorry?
13           MR. BURKE:  FMC Devens, the hospital there.
14           THE COURT:  FMC Devens?
15           MR. BURKE:  D-E-V-E-N-S.  It's in Massachusetts.
16           THE COURT:  That's the facility that you want me to
17  recommend?
18           MR. BURKE:  Yes, please.
19           THE COURT:  That's because of the medical facilities?
20           MR. BURKE:  Correct.
21           THE COURT:  All right.  Any other recommendations?
22           MR. BURKE:  No, Your Honor.
23           THE COURT:  No?  Anything further from the government?
24           MS. KIM:  No, Your Honor.  Thank you.
25           THE COURT:  All right.  There being nothing further,
```

1  this matter is -- we are in recess.

2             THE DEPUTY CLERK:  Court's in recess.

3             (Time noted:  1:15 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25